IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 17, 2019

## STATE OF TENNESSEE v. BRUCE D. MENDENHALL

Appeal from the Criminal Court for Wilson County
No. 07-0579      John D. Wootten, Jr., Judge

_____

### No. M2018-02089-CCA-R3-CD

_____

The Defendant, Bruce D. Mendenhall, was convicted by a jury of first degree premeditated murder and abuse of a corpse, for which he received sentences of life and two years, respectively. His sentences were ordered to be served consecutively to one another, as well as to two prior consecutive sentences from Davidson County of life imprisonment for murder and thirty years for three counts of solicitation to commit murder. On appeal, the Defendant challenges the following: (1) the trial court's reliance on the doctrine of collateral estoppel to deny his various motions to suppress certain evidence, wherein he raised threshold constitutional issues; (2) the trial court's denial of his motion to exclude 404(b) evidence and the failure to redact his police statement accordingly; (3) the trial court's denial of his motion to continue based upon the State's late disclosure of surveillance footage from the truck stop; (4) the sufficiency of the evidence supporting his convictions; and (5) the imposition of consecutive sentencing. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Shelley T. Gardner, District Public Defender; Kelly A. Skeen, Assistant Public Defender (at trial and on appeal); and William K. ("Bill") Cather, E. Marie Farley, and Lindsay N. Graham (at trial), Assistant District Public Defenders, for the appellant, Bruce D. Mendenhall.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Brian W. Fuller and Jason L. Lawson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

On the morning of June 6, 2007, Symantha Winters was found dead inside a trash can at a Pilot truck stop in Lebanon, Tennessee. Later that same month, in the early morning hours on June 26, 2007, another woman, Sara Hulbert, was found dead at the Truck Stops of America station ("TA") in Nashville. The Defendant, a truck driver, was arrested on July 12, 2007, in connection with their deaths. He was later indicted in Davidson County for the first degree premeditated murder of Ms. Hulbert and in Wilson County for the first degree premeditated murder of Ms. Winters, along with abuse of Ms. Winters's corpse. See Tenn. Code Ann. §§ 39-13-202, -17-312. While the Defendant was in custody, he was charged in Davidson County with five counts of solicitation to commit first degree murder of individuals involved in these cases. The Defendant was tried and convicted of three counts of solicitation to commit first degree murder, and this court affirmed the Defendant's convictions on appeal. See State v. Bruce D. Mendenhall, No. M2010-01381-CCA-R3-CD, 2013 WL 360525 (Tenn. Crim. App. Jan. 30, 2013), perm. app. denied (Tenn. June 11, 2013). The Defendant was also tried and convicted of the first degree premeditated murder of Ms. Hulbert, and this court likewise affirmed that conviction on appeal. See State v. Bruce D. Mendenhall, No. M2010-02080-CCA-R3-CD, 2013 WL 430329 (Tenn. Crim. App. Feb. 4, 2013), perm. app. denied (Tenn. June 12, 2013). Following the conclusion of the two Davidson County cases, the Defendant was tried in Wilson County for the murder of Ms. Winters, the victim in this case ("the victim").

1. Pretrial Matters

A. Notice of Alibi. On June 14, 2012, the Defendant gave notice of alibi, but no specifics of the Defendant's alibi were included in the notice. The Defendant again filed a notice of an alibi on September 15, 2017. This time in the notice, the Defendant claimed that he "was not in Lebanon, Tennessee on June 5, 2007, nor June 6, 2007, but was en route from Goldsboro, North Carolina to Kalamazoo, Michigan, specifically via Pioneer, Tennessee."

B. Constitutionally-Based Suppression Issues. On June 29, 2012, the Defendant filed a "Motion to Suppress Evidence Seized from [His] Truck," arguing that "all the evidence obtained as a result of the seizure of the [D]efendant and the search of his truck by Metropolitan Nashville Police Department on July 12, 2007, . . . was obtained in violation" of his constitutional rights and that suppression of the evidence was required. Specifically, the Defendant contended that the investigative stop of his truck was not supported by reasonable suspicion, that he was seized when the sergeant took his driver's license, and that his consent to search his truck was not knowingly and voluntarily given. That same day, the Defendant filed a separate "Motion to Suppress [his] Statements to

Police," submitting that his statements "to law enforcement officers on July 12, 2007, . . . were the product of hi[s] being unlawfully seized by the police and subsequent coercive interrogations by the police." In particular, the Defendant maintained that "all" of his statements were fruit of his illegal detention that was lacking in reasonable suspicion; that he was subjected to custodial interrogation without the benefit of <u>Miranda</u> warnings while the sergeant searched his truck; that the "small talk" conversations the officers engaged in with the Defendant while the Defendant was being transported following his arrest "constituted the functional equivalent of interrogations without <u>Miranda</u> warnings"; and that the <u>Miranda</u> warnings given at the police station were ineffective to cure the taint created "by the prior unlawful interrogation or interrogations."

On March 25, 2013, the Defendant filed a "Motion to Suppress or Exclude Testimony of, and Recordings Allegedly Made by, Purported Jailhouse Informants." The Defendant submitted that "all of the alleged information and recordings provided to the State by these purported jailhouse informants" were obtained in violation of his constitutional rights. Specifically, the Defendant complained that he had already invoked his right to counsel when the State engaged in "covert operations" by "sending these inmates to act as its agents in trying to obtain incriminating information against" him.

The State, on April 29, 2013, filed a response to the Defendant's motions, arguing that these suppression issues involved the same facts relevant to the search and the Defendant's police statements that had been presented in the Davidson County solicitation and murder cases. The State noted that the Davidson County trial court had previously determined these issues to be without merit, and those decisions had been affirmed by this court on appeal in two separate opinions. So, according to the State, the "law of the case" doctrine barred the Defendant from relitigating the same issues that had already been decided in a prior appeal of the same case or, alternatively, that the doctrine of collateral estoppel applied because the issues had been previously determined in a prior suit between the same parties.

The Defendant filed a written response on April 30, 2013, replying that the law of the case doctrine did "not apply because this [was] not the same case as the two Davidson County cases" and that collateral estoppel did "not apply because the judgments in those cases [were] not final" given that applications for permission to appeal were still pending before the Tennessee Supreme Court. The Defendant seemingly agreed that the precise issues were the same as those raised in the previous two Davidson County cases. The suppression issues as detailed by this court in its two previous opinions reflect that these were indeed the same.

After hearing argument by both the parties at a hearing on April 30, 2013, the trial court ruled that the Defendant was collaterally estopped from relitigating these threshold

suppression issues because they had already been litigated in the Davidson County cases.[1] In a written order that followed, the trial court first referenced the State's argument "that litigation of these issues [was] precluded under the doctrine of law of the case and/or collateral estoppel." The trial court then noted the following facts in rendering its decision that "the State's motion" seeking issue preclusion was "well taken": "[t]hese suppression issues were previously litigated in two cases against this defendant in the Criminal Court for Davidson County"; "[t]he defendant was represented in those cases by appointed counsel not affiliated with his appointed counsel in this case, and his counsel in this case did not participate in the Davidson County cases"; "[t]he Davidson County court ruled in favor of the State, declining to suppress the evidence and statements"; "[t]hose cases were then tried to separate juries, and both trials resulted in convictions"; "[t]hose convictions, including the suppression issues, have been affirmed by two separate panels of the Court of Criminal Appeals"; and "on June 11, 2013 and June 12, 2013, respectively, the Tennessee Supreme Court issued its rulings denying the [D]efendant's T[ennessee] R[ules of] A[ppellate] P[rocedure,] Rule 11 applications in both the Davidson County cases," rendering "the judgments in those cases . . . unquestionably final." Accordingly, the trial court determined that it would not conduct any additional evidentiary hearings "on those same issues" and would rely "on the rulings that [were] now part of the final judgments in the two Davidson County cases." The case proceeded to trial.

C. Evidentiary-Based Suppression Issues. Alternatively, the Defendant made several evidentiary-based arguments in the event that the evidence seized during the search of his truck and his various statements were determined to be constitutionally obtained. On March 25, 2013, the Defendant filed a "Motion to Exclude Any and All Evidence of Other Alleged Crimes or Bad Acts of the Defendant." The Defendant submitted that "any arguably relevant evidence of other alleged crimes or bad acts of the [D]efendant should be excluded" under Tennessee Rules of Evidence 403 and 404. Relative to Rule 403, the Defendant argued that "any and all evidence of other alleged crimes or bad acts of the [D]efendant should be excluded . . . because its probative value, if any, [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury and waste of time." Next, the Defendant contended, relying on Rule 404(b), that the evidence should be excluded "because it [was] highly prejudicial propensity evidence." Finally, relative to Rule 404(a), the Defendant maintained that the evidence should be excluded because it provided "evidence of the [D]efendant's character, and neither the character of the accused nor of the deceased [was] at issue in this case."

---

[1] Although the recordings made by the jailhouse informant were not specifically referenced, the same rationale regarding the initial threshold constitutional issues would apply to the Defendant's motion to suppress those recordings because that suppression issue was also previously determined in the two prior Davidson County cases. The Defendant even acknowledges such in his later filings.

Also, as noted above, the Defendant filed a "Motion to Suppress or Exclude Testimony of, and Recordings Allegedly Made by, Purported Jailhouse Informants." After raising the constitutional issue therein, the Defendant asserted that "none of the alleged information and recordings pertain[ed]" to his case and that, therefore, testimony from the informants, as well as admission of the recordings, "would not provide any [relevant] information" as defined by Tennessee Rules of Evidence 401 and 402. Next, the Defendant maintained that, even if the evidence was relevant, it should be excluded by Tennessee Rules of Evidence 403 and 404(b). Relative to Rule 403, the Defendant submitted that the probative value of the evidence, "if any, [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury and waste of time." Relative to Rule 404(b), the Defendant alleged that the evidence "contain[ed] references to other alleged crimes or bad acts of the [D]efendant, which [was] highly prejudicial propensity evidence and [had] no bearing on any material issue." Finally, the Defendant contended that any such evidence should be excluded under Rule 404(a) because it arguably "contain[ed] evidence of the Defendant's character, and neither the character of the accused nor of the deceased [was] at issue."

Likewise, on March 25, 2013, the Defendant filed a "Motion for Pretrial Ruling Excluding Defendant's Videotaped Interview by Police on Evidentiary Grounds." He again relied on Tennessee Rules of Evidence 401, 402, 403, and 404(b), arguing that the evidence was not relevant because it "contain[ed] only a brief discussion of the Pilot truck stop in Lebanon, Tennessee, . . . the location where the body of the deceased in this case was found"; that even if the recording did contain "some" relevant information, the "extensive statements" by the Defendant during the interview "about other crimes and/or bad acts in which he was allegedly involved to one extent or another, as well as significant details about his actions in connection with a homicide in Davidson County, . . . made up almost the entirety of the videotape, [and were] certainly not relevant" and required exclusion; that even if "those portions of the recording" were determined to be relevant, "the unfair prejudicial effect against the [D]efendant, the confusion of the issues and misleading of the jury those statements would create would substantially outweigh any probative value" of the statement; and finally, if "portions" of the recording were admissible, the recording required redaction to only include statements "directly related to the Wilson County homicide."

On April 4, 2013, the State filed a "Brief of Law in Response to the Defendant's Motion to Exclude Evidence of Prior Bad Acts of the Defendant." In the response, the State outlined the specific items of evidence from the other trials that it sought to present against the Defendant during this trial and for what purposes, other than propensity, it sought to introduce the evidence.

On October 2, 2017, the Defendant filed an extensive brief discussing prior bad act evidence, specifically discussing the State's seeking "to introduce evidence of both of the Defendant's convictions in Davidson County." According to the Defendant, the State's "premise [was] that everything admitted as evidence in the Davidson County cases [was] relevant and direct evidence of the offense in Wilson County." The Defendant proceeded to cite to an abundance of caselaw on the admission of prior bad act evidence. The Defendant argued that the solicitation case had "no relevance to the Wilson County case." The Defendant commented that the solicitation convictions were relevant and admissible to show motive in the Davidson County murder case, but not here, "because the Defendant believed that the targets of the solicitations were conspiring to have the Defendant convicted of the murder in Davidson County." Even if deemed to be relevant, the Defendant submitted that admitting evidence of the solicitations was "marginally probative at best" because they were not "probative of any aspect of the homicide" in Wilson County and they did not establish "motive, intent, identity, or even guilty knowledge of the Wilson County event." Moreover, admission of such evidence, in the Defendant's opinion, "would serve to confuse the jury as to the issues in the instant case."

As for the Davidson County murder case, the Defendant remarked that it was "so similar to the act" for which he was on trial "the danger of convincing the jury that the Defendant [was] guilty because of his propensity to commit the similar act more than substantially outweigh[ed] its probative value." The Defendant averred that its admission "would serve to prevent the jury from hearing and individually considering the separate and specific pieces of evidence, as well as lack of evidence, relevant in the instant case[,]" thereby "relieving the State of its burden of proof in this specific act in Wilson County."

The Defendant further argued that admission of the prior convictions and alleged murders was not "necessary to complete the story [or] to help the jury to understand the background evidence" offered at trial and, therefore, amounted to propensity evidence. The Defendant opined that background evidence "[was] not always appropriate . . . when the evidence [was] not a part of the same criminal transaction" and that such was the case here because "[t]he only background story [was] that the same man was charged for both acts, three weeks apart in different locations."

In addition, the Defendant maintained that the prior bad act evidence was not admissible to prove his identity. According to the Defendant, his actions were not so unique to be considered a modus operandi, there being "nothing distinctive in the Wilson County homicide or in the Davidson County." The Defendant surmised that "a body found murdered at a truck stop [was] far from unique" but was "similar enough to prejudice the jury into a decision based on other bad acts." The Defendant also noted that

the evidence in the Davidson County murder case "was substantial and could be easily transferred to the instant case in order to convince a jury that [the Defendant] committed the same act in Wilson County, thereby overwhelming the facts of the case."

Relative to redaction of his police statement, the Defendant noted that the trial court in the Davidson County solicitation case "admitted only a redacted version of the [D]efendant's statement to police in order to establish the motive for the solicitations, and by extension, to provide contextual background to the jury." According to the Defendant, the trial court in that case redacted "all statements regarding the other murders the Defendant may have committed, but did not exclude the entire statement as the defense had requested, because the details of the statement which included [the Davidson County murder] helped to explain the focus on the victims in the solicitation trial." The Defendant also commented that the trial court, prior to admission of the statement in the solicitation case, "instructed the jury that it could only consider the Defendant's statement for the limited purpose of determining whether . . . it provide[d] a complete story of this alleged crime that he's on trial for."

In conclusion of his argument, the Defendant stated the following:

> The bad act evidence which the State seeks to have admitted in the instant case lacks probative value for anything except propensity. It does not prove identity in that any truck driver who travels through middle Tennessee could fit the known facts of both murders. It does not prove motive, guilty knowledge, or the absence of mistake. It is not the type of evidence which would be properly admitted to challenge the veracity of the Defendant. Additionally, the facts of the two homicides are not close enough to show a common scheme or plan, or modus operandi. The evidence of bad acts which the State seeks to introduce should not be admitted because, according to Tennessee State case law, its probative value is substantially outweighed by the danger of unfair prejudice to the Defendant.

The trial court held an extensive hearing on these motions on February 1, 2018. At the hearing, both parties made arguments, and the State presented testimony from a Wilson County detective who investigated the victim's murder, a Davidson County detective who investigated Ms. Hulbert's murder, and the tool mark and firearms examiner who examined the Defendant's rifle and the bullets removed from the victim's and Ms. Hulbert's heads.[2]

---

[2] In an effort to avoid repetition, we will not detail the testimony from these three witnesses here. A summation of their testimony at trial can be found below.

In rendering its ruling, the trial court noted that it was holding a hearing outside of the jury's presence as required by Rule 404(b). The trial court also found that the evidence of other crimes and bad acts by the Defendant was established by clear and convincing evidence, noting that "all of those Nashville instances" were "found by a jury beyond a reasonable doubt."

The trial court ruled that all of the evidence was admissible for other purposes. Specifically, the trial court found that the evidence was first admissible to provide "context" and "complete the story." The trial court noted that proof of the victim's murder was not necessary in the Davidson County murder case because "there was no need for it" given that "[t]he bullet matched the .22." However, in this case, the trial court found that evidence of Ms. Hulbert's murder was necessary, reasoning, "I find specifically that in order to complete the story, the timeline, to be able to understand the connection between the bullet recovered from the victim in this case versus the bullet from Ms. Hulbert in Nashville, it would be nonsensical if I didn't allow that in." Moreover, the trial court stated that the Defendant's police statement provided "part of the overall picture here, complete story, if you will."

Relative to redaction of the Defendant's statement to exclude references to the other murders, the trial court observed, "It would likewise be nonsensical to redact the statement of the [D]efendant that talks about these individuals involved in all these killings that just seem to show up inexplicably at various truck stops and then people die, and he blames directly two or three individuals." The trial court noted that the Defendant had also given notice of alibi. The trial court determined, "So in order to put all of that in context, once again, that's the complete story of the case."

Regarding admission of the recordings of the conversations between a jailhouse informant and the Defendant, the trial court concluded that they were also admissible to complete the story. The trial court reasoned that the recordings put "in context all of the statements made" about the victims and the victims' vocation.

The trial court next determined that the evidence was admissible to establish the Defendant's identity. The trial court stated that for example, the evidence showed that the Defendant's weapon was used "in both places[.]" The trial court further stated its reliance on the multitude of cases cited by the State in support of admission of the evidence to prove identity.

Moreover, the trial court concluded that the evidence was admissible to provide the Defendant's motive and intent. The trial court cited to the Defendant's statement to his employer that he "just shoots" "lot lizards" and to the sign found in the Defendant's truck, "4-sex ok." The trial court also remarked that the sign found in the Defendant's

truck was proper to show context, to complete the story, and to establish identity because "[a]ll of those things overlap in this case."

Finally, the trial court determined that proving a "common scheme or plan" was "equally applicable" to support admission of the evidence for other purposes. The trial court observed the similarity between the two murders: "You've got two prostitutes found in a location toward the rear of truck stops essentially nude, shot in the head with a .22."

As for its final consideration, the trial court opined that the probative value of the evidence was "not outweighed by the danger of unfair prejudice." In addition, the trial court stated that it would provide instructions the jury on how to properly consider the evidence.

D. Discovery and Continuance. The Defendant filed both a "Motion for Discovery and Inspection" and a "Motion to Compel Production of Exculpatory Evidence" in February 2012. At the pretrial motion hearing on February 1, 2018, defense counsel stated, "I just learned today that there are video recordings from the Pilot truck stop on the dates in question, and I don't have those. [The State is] going to try and get those to me." The prosecutor stated that the 2007 recordings were on VHS tapes and that it hoped to "find a way" to get those transferred onto DVDs. It was averred that the prosecutor had not been aware of the recordings previously because they had been in the possession of the Wilson County lead detective. On February 6, 2018, the Defendant filed a motion to compel the State to turn over these recordings. In the motion, the Defendant averred that the detective, in the days following discovery of the victim's body, acquired surveillance footage from the Pilot truck stop covering the relevant dates. According to the Defendant, the surveillance footage contained "potentially exculpatory evidence for the Defendant," and the defense had "repeatedly requested" the recordings from the State. The Defendant surmised that the detective's failure "to wait until this late date to advise counsel that these recordings were in his possession since June 2007," amounted to "gross negligence."

Three days later, the Defendant filed his fourth motion to continue the case, contending that more time was needed to prepare his defense in light of this potentially exculpatory evidence withheld in discovery. The Defendant also stated that the trial court "overruled itself on several issues during the" motion hearing on February 1, 2018, i.e., that the trial court decided it was no longer proceeding under the law of the case doctrine as shown by its admission of the Defendant's police statement in its entirety, which was contrary to the Davidson County trial judge's ruling redacting the statement. The Defendant averred that he "require[d] additional time to prepare [his] defense against allegations of bad acts in Nashville and in several other states."

- 9 -

A pretrial motion hearing took place on February 13, 2018. Defense counsel[3] stated that he was in possession of the recordings, receiving them the same day he had filed the motion to compel. Defense counsel averred that he had "found a program" allowing the defense to "read" the recordings, but he "estimated it would take [thirty-six] to [forty] hours to read" those. Defense counsel indicated that there were approximately six DVDs, each running about one and one-half hours long "at a super fast pace." Defense counsel explained,

> I did manage to manipulate it to where I could slow it down and I cleaned it up as far as fuzz and stuff, and you can view them, but in order to view an hour and a half DVD, it's going to take six to eight hours because of the speed when you slow it down from where it is. So it's going to take a substantial amount of time to go through all that.

The prosecutor confirmed that the surveillance footage covered June 4th through the 6th of 2007, that there were "multiple camera angles" depicted on the recordings, and that the defense was unable "to do anything about the speed." The prosecutor also explained the circumstances surrounding the late discovery of the recordings—that "it did take [the detective] a while to watch [the recordings] sufficiently"; that the detective "put" the recordings "into evidence" in January 2009 once he finished; that the detective "did provide [the prosecutor] with a property . . . receipt from that time, but anything else in the file that [the prosecutor] had" did not reflect possession of the recordings; and that the prosecutor did not know of the recordings until speaking with the detective in preparation for trial.

Nonetheless, the prosecutor observed "that these videos [were] primarily inside the Pilot" and that "[t]here [was] a portion" of the recordings showing "outside," but that those did not depict the location where the victim's body was found. The prosecutor indicated that the detective had reviewed the recordings in their entirety and that neither the Defendant nor the victim could be seen in any of the footage. Defense counsel then maintained that he needed to review the "videos in order to determine who else was on the property."

Defense counsel noted the "other issue" it had included in the motion to continue about the trial court's changing its previous ruling regarding the law of the case doctrine and that the Defendant's entire police statement was now admissible. The trial court replied that it was "troubled" by the Defendant's assertion because it had not changed its ruling that the law of the case did "not apply anymore." The trial court noted that its ruling concerning the law of the case dealt with the threshold constitutional issues of

---

[3] Two of the Defendant's lawyers were involved in this discussion. We will refer to them collectively as defense counsel.

suppression but did not foreclose evidentiary-based issues, such as Rule 404(b) evidence. The trial court stated that at the February 1, 2018 hearing, it made "specific rulings with regard to the State's notice of prior bad acts, crimes, those types of things under 404(b) that would be admissible in this case." While acknowledging that the Davidson County trial court judge in the murder case redacted the Defendant's police statement to remove the Defendant's references to the other killings, the trial court explained that it did not disagree with the trial court's ruling in that case but that "this case st[ood] on its own facts," which were "completely different from all the facts down in Davidson County." The trial court observed that for example, in the Davidson County murder case, the Defendant was found returning to the location where the victim's body was found, and the Defendant admitted to helping pose the victim. The trial court continued, "I just don't believe there's any way to cut and splice and redact and those kinds of things to even come close to explaining or presenting a case here unless you use the man's statement." The trial court again noted that it would instruct the jury on how to properly consider the evidence.

The trial court then asked defense counsel, "How would you have me redact this interview? Have you made any suggestions about that, assuming I revisit this?" Defense counsel stated that he had "a list of suggestions" that had "to do with the out of state" killings mentioned by the Defendant in the statement. The trial court said that it "doubt[ed] seriously" that it would reverse its decision because the statement had "to flow" to "make any sense" to the jury. The trial court stated that defense counsel could submit its redactions and that the trial court would "relook at that" and possibly "consider redacting . . . the out-of-state stuff." The trial court noted that if it decided to allow the redaction, there would need to be "some time to cut the tape" and have the transcript, as redacted, prepared.

Discussion then returned to whether the case should be continued. Defense counsel stated that in addition to the previously cited reasons, he also wanted to allow the court reporter time to prepare the transcripts from the various pretrial hearings. When asked why the transcripts were needed, defense counsel replied, "Because there were statements made by the witnesses during those hearings that had not been made before," specifically from the tool mark and firearms expert. The trial court again inquired why the transcript was needed when defense counsel could recite "what the problems and inconsistencies" were in the witness's testimony. Defense counsel responded that the transcript was needed in the event the tool mark and firearms expert testified that he did not recall making the statements. More discussion ensued about the time it would take to get a transcript prepared, including whether only a transcript of the expert's testimony was necessary.

Upon inquiry from the trial court, the State informed the trial court that it had approximately fifteen to eighteen witnesses subpoenaed for trial, that at least five to six of those witnesses were coming from out-of-state, and that changes in accommodations would need to be made if a continuance was granted. The prosecutor expressed his opinion that he did not want the trial continued. The trial court observed that this case was "old, old, old" and that it had been "set now for months." The trial court asked the prosecutor if the Tennessee Bureau of Investigation ("TBI") "ha[d] the ability to do something with these tapes," and the prosecutor said, "Not anymore than what they've already done . . . . I mean, the time is what it is." The trial court noted that a decision on whether to the continue the case was within its "sound discretion" and denied the Defendant's motion. The State then made the tool mark and firearms expert's "notes on the rifle and examination," wherein the expert discussed the "ring of rust, the cleaning of the overmarking, [and] all those sort of things," an exhibit to the hearing, and the prosecutor averred that the expert's report was provided to the defense in April of 2013.

No other discussion on redaction of the Defendant's police statement or the preparation of the expert's testimony is apparent from the record. However, there is an exhibit in the record that contains solely the expert's testimony at the February 1, 2018 hearing.

2. Trial

The Defendant's trial in this case spanned four days, beginning on February 27, 2018, and concluding on March 2, 2018. Following opening arguments and before the presentation of any proof, the trial court instructed the jury regarding how it was to consider potential evidence "of other wrongs or acts" committed by the Defendant, including "crimes in Nashville":

[Y]ou may not consider such evidence if it comes out to provide [the Defendant's] disposition to commit the crime on trial here in Wilson County. I'm going to allow this proof as it unfolds for a variety of other purposes. For example, it could be to complete the story of the crime here in Wilson County, because it's logically related or connected. . . . That's one reason.

Number two, the [D]efendant's identity, that is, this evidence could be considered by you if it tends to establish the [D]efendant's identity as the person who committed these crimes here in Wilson County. It could also be admitted, and I'm going to allow certain things. And I'm going to probably, you'll hear this or parts of this instruction as we unfold this case, to show a common scheme, scheme or plan to establish that the

- 12 -

[D]efendant engaged in a common scheme or plan, vis-à-vis Nashville or to here, motive and there could be other reasons as well.

The trial court concluded the instruction by telling the jury that this instruction could possibly "be given multiple times" during the trial, as well as being given "at the end of this case." The trial court explained that the instruction "may be more complete or it may be edited some" on those occasions. The case proceeded.

Charles Scruggs, the "outside maintenance person" for the Pilot truck stop in Lebanon, testified that he was collecting trash from the outside garbage cans of the station on the morning of June 6, 2007. Just before 8:00 a.m., Mr. Scruggs discovered the victim's body in a trash can towards the rear left corner of the parking lot. He reported the discovery to his general manager, and the police were called to the scene, arriving approximately five to ten minutes later, in Mr. Scruggs's estimation.

Lebanon Police Department ("LPD") Officer Cornelius Harris responded to the scene and observed the victim's body in the trash can "that was in the back fence area" of the truck stop. Officer Harris estimated that the fence was about ten to fifteen feet from the parking area and that the garbage can was about five or six feet[4] from the parking area. The parking stall in front of the trash can where the victim was found was empty upon Officer Harris's arrival; a truck was parked on both sides of the empty parking stall. Officer Harris sketched the parking lot, which depicted all of the trucks parked in the area with their respective tag numbers.

LPD Detective Kirk Whitefield testified that he was the lead detective in the victim's murder. Detective Whitefield spoke with the driver parked to the right of the empty stall, Mr. Todd Crafts. Mr. Crafts told Detective Whitefield that he had stayed the night at the truck stop. According to Mr. Crafts, when he awoke on the morning of June 6, 2007, between 6:30 and 6:45 a.m., the garbage can, which had previously been visible to him from his parking stall, could no longer be seen. Detective Whitefield also talked with the driver parked to the left of the empty stall, Mr. Joseph Burnett. Mr. Burnett said that he arrived at the truck stop that morning about 7:30 or 7:45 a.m. before going inside the station. He did not notice the garbage can upon his arrival.

The driver who had been parked in the stall directly in front of the trash can, Mr. Greg Pesnell, had already moved his truck before police arrived. At that time, his truck was parked "closer up" to the gas pumps of the station. Mr. Burnett had informed Detective Whitefield that he had seen Mr. Pesnell's "going in and out of the passenger side of his vehicle" when Mr. Pesnell was parked in the stall, a behavior Mr. Burnett found "odd."

---

[4] This estimate marginally varied during other testimony.

Mr. Pesnell was "cooperative" and was interviewed by LPD Detective Eddie Brown. During the interview, Mr. Pesnell explained that he was using the passenger-side door of his truck because when he locked the driver-side door, it could not be unlocked. The truck's broken locking mechanism was confirmed by Detective Brown.

In addition, Mr. Pesnell's truck was searched after he gave consent. The interior cab of Mr. Pesnell's truck was searched twice; the second time the truck was searched included the use of "an alternative light source to see" if there was any blood inside the truck. No blood was found. During the search of the outside of the truck, the officers found "three drops" of what appeared to be blood on the blue tarp covering the rear of Mr. Pesnell's trailer. Detective Whitefield said that the "little drops appeared to . . . be like cast off, almost like what was on [the victim's] back." Detective Whitefield also noted that the victim was placed in the trash can "with her head leaning toward the truck, toward the front." Two pieces of the tarp were cut out and preserved. There was also "one spot" on the bumper of Mr. Pesnell's truck that was swabbed.

Detective Brown stated that after the samples of the tarp were collected, they opened up "the back of the trailer" and photographed "that area." Detective Brown did not recall "search[ing] the whole entire trailer"; however, he indicated that they did not observe anything suspicious inside the trailer once they opened it. Detective Whitefield concluded that there was nothing from the search of the truck or the interview of Mr. Pesnell "that suggested he had any involvement" in the victim's murder. Mr. Pesnell was not taken into custody. No fingerprints or DNA sample was obtained from Mr. Pesnell.

Officer Harris obtained waivers for consent to search from several other drivers parked in the immediate vicinity of the trash can, which included waivers from both Mr. Burnett and Mr. Crafts. According to Officer Harris, these searches did not reveal any evidence linking any of those drivers to the victim's murder. Detective Whitefield also asserted that from his conversations with the other truck drivers, he had no "reason to suspect that they were involved[.]"

LPD Officer Chris Melvin was involved in processing the scene. Officer Melvin said that the victim's "body was feet first in the trash can"; that her "head was hanging over the rim of the trash can"; that there were "items of garbage" on her back, including "two plastic, grocery-type bags" and a Taco Bell "food box"; that inside one of the plastic grocery bags were three beer cans, a pack of cigarettes, "two empty cigarette packs, and other paper-type trash"; that inside the other bag were "a couple of boxes" in addition to the Taco Bell box; that there were "reddish-brown droplets on top of her back," which appeared to be blood; and that these droplets "appeared to have been dropped straight down onto the surface from above the victim." According to Officer Harris, the items of trash were "just [lying] on top" of the victim's back; they were "not half shoved down or anything like that[.]"

- 14 -

Detective Whitefield also described his observations of the victim's body, stating that the nude victim "appeared to be positioned" in the garbage can because "she was set straight down in, feet first, almost like placed there, leaned forward to be found." Detective Whitefield further noticed an injury to the victim's forehead and possible blood "smeared on [the victim's] face."

Officer Harris was involved in removing the victim from the garbage can. Before removing her, they "constructed a plastic tent around the trash can" and then "use[d] super glue fuming on the body to try to develop any type of latent prints that were left behind." They were unable to observe any prints. They then removed the victim's nude body from the trash can, and Officer Harris saw "a large amount of blood" on the victim's head. Detective Whitefield moved the victim's hair, which "was matted in blood," and observed that she had suffered a gunshot wound "through the top part of [her] right ear."

The items inside the trash can, as well as the barrel itself, were taken into evidence. Officer Harris also collected from the empty parking stall "a cigarette butt, a piece of rolled wire, and a crushed can," as well as "[a] sample of vomit" from the "back in the grassy area." There were other items collected from the area, but Officer Harris could not recall specifically what they were. The victim's clothing was not located at the scene.

Detective Whitefield testified that he "recovered VHS tapes, security surveillance tapes from the Pilot" taken on June 4th through 6th of 2007. Detective Whitefield averred that over an extensive period of time following the Defendant's apprehension, he watched the surveillance tapes from June 5th and 6th, which were "basically time lapse tapes with about [fourteen] cameras on them." According to Detective Whitefield, these tapes were "constantly flashing," the screen changing "more than every second." Detective Whitefield explained, "At the time, we had a VCR where you could slow the play process down, but it still changes camera to camera to camera. There wasn't a way to put it on one camera and just watch that camera. It would cycle through all the cameras."

An exhibit was entered reflecting the fourteen different camera angles from the surveillance footage. Detective Whitefield described the camera angles:

> Twelve are from inside the business, including the driver's lounge, the office, maybe, it even looks like a cooking area. Two are from outside. One reflects the front gas pumps that would be in the front of the store, closest to 231 South. And the other is kind of the, I know it's an outside, looks like a loading dock[.]"

According to Detective Whitefield, there was no "camera angle back in the area where the body [was] found[.]" Detective Whitefield indicated that he did not see the Defendant or the victim on the surveillance tapes, although he clarified that it was "possible that they just didn't come in the store."

Detective Whitefield confirmed that the victim was later identified by her fingerprints. He affirmed that the victim had an arrest record, "mainly" her being arrested multiple times in Davidson County for prostitution. When asked why the victim's arrest record was relevant to his investigation, Detective Whitefield said,

> Due to the area she was found, around a truck stop, transient in nature like that. With her being a prostitute that, that kind of opens it up to possible, [sic] with her being from Nashville, also, I thought that she might have been picked up in Nashville by someone and then that's how she ended up in Lebanon.

Detective Whitefield was able to determine that the victim was last seen alive the previous day on June 5, 2007, when she had been involved in a traffic stop around 2:00 p.m. Detective Whitefield spoke with the officer who conducted the traffic stop; the victim was a passenger in the vehicle. Detective Whitefield also spoke with the driver of that car, who told him "that [the victim] was seen walking down the street and got into a van."

Dr. David Zimmerman reviewed the victim's autopsy report. The autopsy established that the victim died from a gunshot wound to the right side of her head and that the manner of death was homicide. According to Dr. Zimmerman, there was no soot or stippling on the victim's head. A bullet and two fragments were recovered from the victim's head during autopsy. A "sexual assault kit" was also collected. The toxicology report showed the presence of cocaine in the victim's blood.

TBI Agent Steve Scott was qualified by the trial court as an expert in tool mark and firearms comparison. He first examined the bullet and bullet fragments from the victim's head in isolation. Upon examining this bullet and fragments, he was able to determine that the bullet was .22 caliber, but he was unable to find "any marks of value for comparison due to [the bullet's] mutilated condition."

Several weeks later, Detective Whitefield was contacted by a Metro Nashville Police Department ("MNPD") detective who was investigating "a homicide that seemed very similar in nature." Detective Whitefield conveyed that the Nashville victim, Sara Hulbert, was found twenty days later on June 26, 2007, at a TA truck stop about thirty miles away from the Lebanon Pilot. Detective Whitefield explained that Ms. Hulbert was found nude; her clothes were not found at the scene; she was a prostitute; "[t]hey

- 16 -

believed she had been posed"; and "she had a small caliber gunshot wound to the head." Detective Whitefield compared a photograph of Ms. Hulbert's body as it was found at the crime scene with his recollection of how the victim was found, and he found the crime scenes similar in that Ms. Hulbert "had blood on her face that was smeared" and that "there were a couple of drops of blood" on her face that "looked like [they] had [been] dropped down . . . from above." Detective Whitefield also described the manner in which Ms. Hulbert was posed: "She was [lying] on her back, with the bottoms of her feet put together and pushed forward" and her knees "were spread out to the side." The two police departments thereafter began to coordinate their investigations.

MNPD Sergeant Detective Pat Postiglione testified that he was involved in the investigation of Ms. Hulbert's murder. Sergeant Postiglione noted that Ms. Hulbert's "body was positioned" intentionally "in a display-type condition." Sergeant Postiglione testified that shortly after discovering Ms. Hulbert's body, he learned about the victim's murder in Lebanon and the similarities between the two cases. Sergeant Postiglione stated that after speaking with Detective Whitefield about the Wilson County murder, he notified the Federal Bureau of Investigation that they were "dealing with a potential serial killer." According to Sergeant Postiglione, it would "be neglectful" police work to fail to note the similarities between the two murders:

> We had two women who were killed. Both women were prostitutes. Both women were addicted to drugs. Both women hung out at truck stops. Both women were shot with a small caliber weapon. In my opinion, both women were displayed, and the time frame—there was I think a [twenty-one] day or so time frame between the two killings.

MNPD Detective Lee Freeman was also involved with the investigation into Ms. Hulbert's murder, and he had been informed about the victim's murder and the similarities between to the two cases. Detective Freeman provided his description of how Ms. Hulbert "was laid out":

> She was flat on her back with her arms down by her sides, palms up. Her feet were nearly touching but pushed up so that her knees were spread out so that she was basically exposed to anybody that could be seeing her. Her face was covered in blood so—but there wasn't anything—and it also had a very distinct line around her neck where it just appeared that the blood had stopped for some reason. . . . It looked like something had been placed over her head to cause it to smear like that.

Sergeant Postiglione and Detective Freeman testified that they obtained surveillance footage from the TA truck stop, as well as from other businesses in the area of Ms. Hulbert's murder. They eventually were able to develop the Defendant's truck as

- 17 -

a suspect vehicle because the Defendant's yellow tractor-trailer had been seen arriving at the truck stop during the time in question and leaving sixteen minutes later. Although unable to determine the exact location where the truck stopped in the parking lot, they observed the truck proceed to "the back side of the truck stop." According to Sergeant Postiglione, "there were no fuel tickets or food tickets to back up that particular truck." The surveillance footage from the TA was played for the jury.

Following Ms. Hulbert's murder, a .22 caliber bullet was removed from her head during autopsy. Agent Scott was asked to compare the bullet from Ms. Hulbert with the bullet and fragments recovered from the victim's head. When Agent Scott placed the two bullets under the microscope, he "realized that his first report was incorrect" because the marks on the bullet from the victim that Agent Scott previously thought were due to mutilation "were now of value," actually matching the individual markings on the bullet from the Nashville murder. He was able to conclusively state that because the bullets bore the same markings, they "had been fired through the barrel of the same firearm."

On July 12, 2007, Sergeant Postiglione asked Detective Freeman to return to the TA to review fuel tickets from the day of Ms. Hulbert's murder and make certain that they had not missed anything. Around 10:00 or 10:30 that morning, Sergeant Postiglione was on his way to join Detective Freeman at the TA when he saw a yellow tractor-trailer that looked similar to the suspect vehicle. Sergeant Postiglione followed the truck in his unmarked vehicle. Eventually, the truck pulled in to the TA parking lot and parked. Sergeant Postiglione radioed Detective Freeman to let him know that he had spotted a truck similar to the one from the surveillance video and that he was going to approach the vehicle and speak to the driver.

Sergeant Postiglione testified that as he approached the truck, he noticed that the curtains were pulled closed and that the engine was running. Sergeant Postiglione knocked on the door and waited for a response but got none. Sergeant Postiglione knocked a second time, and the Defendant opened the curtains. Sergeant Postiglione testified that with his badge in hand, he informed the Defendant that he was police and asked for the Defendant to step out of the truck and speak to him. According to Sergeant Postiglione, the Defendant agreed, and the Defendant opened the door and "jumped down"; the Defendant's shirt was unbuttoned, and he had no shoes on his feet. Sergeant Postiglione said that the Defendant was stretching as if he had just woken up from sleeping.

The two men began to engage in "general conversation." Sergeant Postiglione informed the Defendant that they "were looking for a vehicle that was similar in nature" to the Defendant's truck, to which the Defendant responded that "there [were] a thousand vehicles out there like" his. At some point, Sergeant Postiglione asked the Defendant for his identification, and the Defendant gave Sergeant Postiglione his driver's license.

Sergeant Postiglione testified that as he spoke with the Defendant, he noticed several drops of what "appeared to be blood or [a] blood-like substance" on the driver-side door.

While Sergeant Postiglione was speaking with the Defendant, Detective Freeman arrived and approached the two. The Defendant was asked if he would consent to give a DNA sample, and the Defendant agreed. Detective Freeman obtained a kit and consent form from his vehicle. Detective Freeman reviewed the form with the Defendant, had the Defendant sign the form, and took the sample.

Sergeant Postiglione then asked the Defendant if he could look inside the Defendant's truck. The Defendant asked if Sergeant Postiglione "was going to tear the vehicle up." Sergeant Postiglione told the Defendant that he would not, so the Defendant gave permission. Detective Freeman then retrieved a consent to search form from his vehicle, and the Defendant signed the form. Sergeant Postiglione asked the Defendant "if there was a weapon in the truck," and "[h]e said there was not."

Sergeant Postiglione testified that once inside the truck, he noticed a roll of "black electrical tape" and a pocket knife between the driver's seat and passenger's seat. Sergeant Postiglione then went into "the sleeper compartment" and sat down on the mattress. Once there, Sergeant Postiglione noticed a trash bag between the driver's seat and the mattress. When he opened the bag, he "saw a lot of what appeared to be fresh, wet blood, numerous napkins, [and] ladies clothing." Sergeant Postiglione testified that he asked the Defendant if he could explain "the blood inside the bag," and the Defendant told Sergeant Postiglione that he had "cut his left leg getting in and out of the truck and that was the reason for the blood on the napkins in the bag." Sergeant Postiglione asked the Defendant to show him the cut. The Defendant "pulled up his pant leg," but "there was no cut, no scab, no scar there." Sergeant Postiglione also indicated that he found a pair of black shoes on top of a blanket inside the truck and that upon inspection, "the print on the bottom of the shoes" looked similar to the shoe print found at the Nashville crime scene. Detective Freeman confirmed Sergeant Postiglione's suspicion regarding the shoes. Sergeant Postiglione said that he "backed off" further searching of the truck when he "found the blood."

Sergeant Postiglione testified that he then asked the Defendant if this was the truck they had "been looking for" but that the Defendant did not respond. Sergeant Postiglione asked the question again if this was "the right truck," and the Defendant "just kind of shrugged his shoulders and said, 'if you say it is.'" Sergeant Postiglione presented "a follow-up question" by asking if the Defendant was "the person [they had] been looking for." The Defendant "just did the same thing, he just kind of stared at [Sergeant Postiglione] for a second." When asked again, the Defendant said, "If you say so." Sergeant Postiglione once again asked the Defendant if there was a weapon in the truck,

and the Defendant told Sergeant Postiglione this time that there was a .22 caliber rifle in the truck.

Detective Freeman placed the Defendant under arrest. Sergeant Postiglione waited with the Defendant "for a patrol car to come to scene" in order to transport the Defendant. Sergeant Postiglione testified that "it was a very hot day" and that the Defendant said he was diabetic and needed medical attention. The Defendant sat in the front seat of Sergeant's Postiglione's car with the air conditioning running while waiting on the patrol car.

When the patrol car arrived, the Defendant was taken to the hospital to be evaluated. A short time later, the Defendant was released from the hospital and taken to the "homicide office" in the police station. According to Sergeant Postiglione, while they were in the car together, the Defendant mentioned that "he was pissed off at Ritchie and David." Because Sergeant Postiglione did not know what the Defendant was talking about, he asked the Defendant why he was angry. The Defendant replied because "they did all the killings." Sergeant Postiglione inquired if the Defendant would be willing to discuss it more when they arrived "downtown," and the Defendant said that he would. Once there, the Defendant agreed to give a formal statement.

In the interim, Detective Whitefield had been notified by the MNPD that they had the Defendant in custody. Detective Whitefield proceeded to Nashville, where he observed the interview conducted by Sergeant Postiglione and Detective Freeman. During the interview, the Defendant first implicated Richard "Ritchie" Kiem and David Powell in the murders, and towards the end of the interview, the Defendant also said that Terry Sanders was involved. The Defendant appeared calm in the recording, which was played for the jury in its entirety. Sergeant Postiglione opined that although the Defendant had been taken to the hospital for treatment related to his diabetes, the Defendant did not "seem off at all in the video."

In his statement, the Defendant described the different locations where Mr. Kiem and Mr. Powell would "just show up." Relative to the murder of Ms. Hulbert in Nashville, the Defendant claimed that he was at a Pilot truck stop in Nashville getting gas when he was approached by these two men. The Defendant claimed that one of the men got in his truck and that the other followed him to the TA. The Defendant explained that once at the TA, he left his truck to buy a sandwich and that when he returned, he found Ms. Hulbert's naked body inside the truck "sprawled out in the back" with "blood everywhere." The Defendant also described that Ms. Hulbert had a plastic bag taped over her head with black "electrician's tape," which was the type of tape the Defendant kept in his truck. According to the Defendant, the men "were laughing about" having had sex with Ms. Hulbert. The Defendant told detectives that he had a .22 caliber rifle in his

truck and that he believed Ms. Hulbert was shot with his rifle "since they've [done] it before" and because he did not see either of them with a weapon before he left his truck.

The Defendant claimed that Mr. Powell and Mr. Kiem took Ms. Hulbert's clothes and personal effects, told him that it was his problem and not theirs, and left. The Defendant told the detectives that he "proceeded to clean the mess up" and that he "dumped" the victim's body behind the truck trailers "in plain view." The Defendant said that he left the victim where she was, and positioned in such a manner, in order for someone to find her.

The Defendant verified with Sergeant Postiglione his claim that the last time he had been in Nashville was May 2007. However, if Ms. Hulbert's killing occurred later than May, he would "have to acknowledge" that he was in Nashville at the time. The Defendant averred that his "log books" would indicate his various locations.

The Defendant went on to claim that Mr. Kiem and Mr. Powell did "it all the time." The Defendant asserted that the men met him "everywhere," but he did not know how they knew his location. When asked how he knew Mr. Kiem and Mr. Powell, he explained that he knew them from when he lived in Southern Illinois. The Defendant indicated that Mr. Kiem's mother, Lori Young, rented a home from him "until [he] found out she was a whore. And [he] spent a year trying to get her out of [his] house . . . and couldn't do it until she beat on [his] . . . [fifteen]-year-old daughter."

Ultimately, the Defendant asserted that Mr. Kiem and Mr. Powell murdered seven women it total. He was asked to describe the murders in reverse chronological order. The Defendant began by detailing the evening just before his arrest when Mr. Kiem and Mr. Powell met him in Indianapolis, Indiana. He claimed that "the same thing" happened at the Flying J truck stop off Interstate 465. He went in to the truck stop to eat around 8:00 p.m. and returned to the two men sitting in his truck. There was a nude "dead girl" with a bag over her head and "blood all over the place." It appeared to the Defendant that she had been shot in the head. This time the Defendant refused orders to dispose of the body. He maintained that the men took her with them, but only did so after threatening the Defendant by shooting at him.

Next, the Defendant described an incident in Birmingham, Alabama, where the two men again located him at a Pilot truck stop. The Defendant went inside and came back to find the men in his truck. The Defendant thought it was odd because the men claimed they were "not going to do nothing." After the men left, the Defendant noticed that his rifle was missing, so he "suspect[ed] something happened." The Defendant maintained that his rifle was somehow later returned to him.

The Defendant was then specifically asked if he recalled this occurring in any areas around Nashville, and he said no. The Defendant then indicated, without prompting, that he had stopped at the Pilot truck stop in Lebanon "every now and then." Suddenly, the Defendant recalled the two men appearing at the Pilot truck stop in Lebanon "[s]everal weeks" prior. He said that he saw them before going inside the station to play video games and that they were gone when he came outside. Initially, he was going to go inside and get something to eat, but he lost his appetite after seeing the two men. The Defendant said it was "[p]ossible" something happened there because he noticed blood inside his truck. He admitted that he cleaned up the blood, although he claimed that he never saw a body on this occasion. The Defendant could not explain how the men were able to get inside his truck.

The Defendant then referenced an event in Atlanta, Georgia, stating that it occurred sometime before the Lebanon incident. The Defendant asserted that two men got inside his truck in Louisville, Kentucky, and that they rode with him to Atlanta. When the Defendant told them they could not ride with him, "they cracked [his] shin" with his rifle and said, "[W]e'll take care of your two daughters then." While at a Pilot truck stop on the "east side" of Atlanta, the two men left with the Defendant's rifle and came "back later." They possibly could have taken his black electrical tape with them, but he could not remember for certain. He indicated that he had two rolls in his truck, but at some point, one went missing. The Defendant was unsure if anything happened in Atlanta.

When the Defendant was asked if there was "anything else," he said that this happened for the first time in Chicago, Illinois, "well before" the incident in Atlanta. He came out of a truck stop to find his truck's door open and his rifle missing. He saw Mr. Powell across the street and asked him what he was doing there. According to the Defendant, Mr. Powell said, "Oh we're up here having a little fun." Shortly thereafter, Mr. Kiem drove up in his truck and threw the Defendant's rifle at him. When the Defendant informed the men that they were going to get in trouble, Mr. Kiem said that they were not going to find any fingerprints on the rifle and warned the Defendant to "remember [his] two girls." The Defendant claimed that although he never saw a body on this occasion, he heard over the "CB" radio that a body was found in Lake Station, Indiana. He clarified that he had been parked at the Pilot in Lake Station when these events took place and that he was merely en route to Chicago.

The Defendant said he did not think the officers would find any prints other than his on the gun. The Defendant then averred that the men wore gloves. Sergeant Postiglione asked the Defendant about the blood he noticed under the Defendant's fingernails, and the Defendant said it got there from "cleaning up" last night in Indianapolis. The Defendant also averred that the blood in his truck came from the

- 22 -

Indianapolis victim. He could not recall putting any clothing in the bag, stating that he "just threw stuff in there." The Defendant said that if blood was found on his gun, it was likely from the Indianapolis victim. He did not believe that any blood would be found on his knife, although he later clarified there "could be."

Although the Defendant was only able to recall these six incidents, the Defendant averred that Mr. Kiem claimed to have killed seven women; they possibly got the Defendant's "gun without [him] knowing it." He did not know how they got in his truck on these occasions, but they "seemed to get in just fine without a key."

The Defendant said he thought about reporting the men to the police, but they threatened his daughters. He claimed that he did go to the police "[a]bout them beating [his] daughter[,] and they told them [to] leave her alone." The Defendant further asserted that he "got a lawyer to go after 'em and she told [him] to leave 'em alone" because they were "dangerous."

The Defendant was again asked if he ever thought about going to the police to tell them "there's two guys going out killing people." For the first time, the Defendant said that there were more than two men involved and implicated a third man, Terry Sanders, who also "used to be" from the same area as the Defendant in Illinois. The Defendant claimed that he only presently knew Mr. Powell's whereabouts.

Upon continued questioning, the Defendant said that the men did not start appearing at the truck stops until he "shot at one of them." The Defendant also agreed that it was possible there was DNA evidence in his truck from each victim he had mentioned. The Defendant insisted that he was not involved in the murders, and that concluded the interview.

After the recording of the Defendant's police statement ended, the trial court again provided the jury with an instruction "about how to use evidence of other crimes or wrongs or acts." The trial court specifically instructed as follows:

> [Y]ou're instructed not to consider some of these references to other crimes, acts or wrongs—it's not used to prove the disposition of this defendant to commit this crime, but I've allowed this to be played to you for you all to consider this as part of the complete story of the crime on trial here and also to further—as another reason, of the [D]efendant's identity. This evidence may be considered by you if it tends to establish his identity in the case on trial.
>
> I would also instruct you that it could be considered as part of a scheme or plan that is such evidence may be considered by you if it tends to

- 23 -

establish the [D]efendant engaged in a common scheme or plan for the commission of two or more crimes so related to each other that proof of one tends to establish the other one.

It could be used to establish motive, that is, such evidence may be considered by you if it tends to show a motive of the [D]efendant for the commission of the offense for which he is presently charged and also with regard to his intent, that is, such evidence may be considered by you if it tends to establish the [D]efendant actually intended to commit the crime for which he is presently charged.

. . . .

Remember, the State of Tennessee has the burden of proof to establish each and every element of this case beyond a reasonable doubt.

Following the Defendant's interview, Sergeant Postiglione and Detective Freeman stated that they located and spoke with Mr. Kiem, Mr. Powell, and Mr. Sanders, and they indicated that all three individuals were cooperative and provided DNA and fingerprint samples. Relative to Mr. Kiem, they also spoke with Mr. Kiem's mother, Lori Young, because Mr. Kiem "was clearly mentally incapacitated" and she was his legal guardian. Mr. Kiem "was unable to make any decision without [his mother's] approval." Medical records for Mr. Kiem were entered into evidence. Sergeant Postiglione said that he was unable to find any evidence that these three individuals were involved in the murders in any way.

Ms. Young, Mr. Powell, and Mr. Sanders all testified at trial. Ms. Young testified that Mr. Kiem suffered from autism and developed schizophrenia at the age of nineteen. She testified that Mr. Kiem was "wholly disabled" and was unable to marry, vote, or testify in a court of law. To Ms. Young's knowledge, Mr. Kiem had never driven a vehicle or been to Tennessee. Ms. Young testified that she met the Defendant fifteen years prior when her truck broke down and she needed a ride to Arizona to borrow money from her grandparents. During the drive, the Defendant offered to rent a house to Ms. Young, and she lived in that house for about three months before they had "a falling out" and she moved out. She had not spoken to the Defendant since.

David Powell testified that he knew the Defendant's daughter and that he met the Defendant through her when he was just eighteen or nineteen years old. He had only been around the Defendant two or three times, and he had not seen him since. Mr. Powell was not aware that the Defendant drove a truck until he learned that the Defendant had implicated him in these murders. Mr. Powell denied that he had "ever been in a place where a person was killed" or that he had "ever made any threats against

any of [the Defendant's] children[.]" Mr. Powell asserted that he had never been to Lebanon, Tennessee, prior to coming to court to testify.

Terry Wayne Sanders II testified that Mr. Powell had previously been married to Mr. Sanders's sister and that the two men were still friends. Mr. Sanders confirmed that he and Mr. Powell met with the police after the Defendant had implicated them "in this heinous stuff" and that they both had provided DNA and fingerprint samples. Mr. Sanders said that he had never "been in a place where a person was killed[.]"

Mr. Sanders provided paycheck stubs from his job, reflecting that he worked fifty-two-and-one-half hours during the pay period ending June 8, 2007, which covered the date of the victim's murder. In addition, relevant to the time period surrounding Ms. Hulbert's murder, Mr. Sanders testified that he was in New Mexico on June 25, 2007, because several of his family members had been involved in a car accident. Mr. Sanders's sister, mother, and nephew survived, but his niece and grandmother were killed in the accident. He asserted that he did not visit Tennessee in the summer of 2007.

Mr. Sanders testified that he had spoken to Defendant "maybe three times," with the last time being "[a]t least fifteen years ago." When Mr. Sanders was fifteen or sixteen years old, he and some friends had vandalized the Defendant's house by wrapping toilet paper and plastic wrap around the Defendant's trees and front porch. Mr. Sanders and his friends did this to approximately twenty-five or thirty other houses that evening, which was around Halloween. Someone from the Defendant's family confronted Mr. Sanders about his behavior.

About a year after the Defendant was incarcerated, Sergeant Postiglione received information that the Defendant was trying to solicit Roy Lucas McLaughlin, a fellow inmate, "to kill some witnesses so they could not testify against [the Defendant] at trial," specifically to have Ms. Young, Mr. Kiem, and Mr. Powell murdered. Thereafter, the police recorded two conversations between the Defendant and Mr. McLaughlin, and those recordings were played for the jury. In the recordings, the Defendant and Mr. McLaughlin agreed on a sum of $15,000 in exchange for murdering the three witnesses, and the Defendant was supposed to contact Mr. McLaughlin's uncle in order to repay the debt.

On the first recording, after some small talk, Mr. McLaughlin told the Defendant that he was worried about what would happen "[i]f they start correlating this s--t after [Mr. McLaughlin][got] out." Mr. McLaughlin stated that he did not think that the Defendant would turn him in to the police but that he wanted to "just go ahead" and "iron everything out." Mr. McLaughlin asked who David was and why he was "on the list." The Defendant told Mr. McLaughlin that David (Mr. Powell) lived with Ms. Young's daughter. The Defendant described Ms. Young's daughter as "a hooker too, that goes to

the three truck stops up there in Anderson." Mr. McLaughlin then said that he was going to cause "a gas leak in the trailer," in which "everybody blows up."

Later in the conversation, Mr. McLaughlin asked, "And you still need those alibis right," and the Defendant responded affirmatively. Mr. McLaughlin claimed to have "them set up for" the Defendant: "Where they were supposed to see [him] and everything." Mr. McLaughlin noted that the three individuals would testify against the Defendant, and he would "go ahead and kill them." The Defendant informed Mr. McLaughlin that Mr. Powell did not live with Ms. Young and Mr. Kiem. The Defendant said that it was not necessary to kill Ms. Young's daughter.

In the second recording, Mr. McLaughlin asked who was "that other dude we were talking about?" The Defendant replied, "David Powell? Or Ritchie." The Defendant then spelled Mr. Powell's name for Mr. McLaughlin and provided Mr. Powell's address. Mr. Laughlin then asked about Mr. Kiem, and the Defendant informed Mr. McLaughlin that Mr. Kiem lived with his mother in a "trailer park." The Defendant then said Mr. Kiem was twenty-six years old, and he also spelled Mr. Kiem's name for Mr. McLaughlin. Mr. McLaughlin asked for a description of Mr. Kiem to make sure he got "the right one," and the Defendant stated that he had not seen Mr. Kiem in years. The Defendant described that Mr. Kiem had "mental problems" and that he attended "an adult learning center." The Defendant explained that Mr. Kiem was not "smart enough to pass" a driver's examination, so his mother dropped off and picked up Mr. Kiem from school. In addition, Mr. Kiem had dark brown hair and a full beard, according to the Defendant.

After the recordings were played, the trial court once more instructed the jury on how it was to consider proof of other "crimes and other wrongs or acts" committed by the Defendant. Specifically, the trial court instructed that such evidence "may not be considered . . . to prove [the Defendant's] disposition to commit this crime on trial but for other purposes such as the complete story of the events that relate to this case, [the Defendant's] identity, common scheme or plan, motive, and, indeed, the [D]efendant's intent[.]"

Danny Davis testified that he was the Defendant's employer through his small trucking firm at the time of the Defendant's arrest. The Defendant had worked for Mr. Davis approximately one year at that time. Mr. Davis recalled a conversation in the weeks prior to Defendant's arrest that involved the Defendant, the Defendant's wife, Mr. Davis, and Mr. Davis's wife. They discussed where the Defendant "was parking at and different locations he was going in and [the Defendant] made reference to these large truck stops." Mr. Davis pointed out that he "wished [the Defendant] wouldn't park in these large truck stops because basically wrecks could happen there and a lot of drug dealers and a lot of prostitution, and [he] didn't like it." According to Mr. Davis, they

started talking about what Mr. Davis referred to as "lot lizards," or prostitutes, being prevalent at the big truck stops, and the Defendant said, "I just shoot them." Mr. Davis testified that the law prohibited drivers from having weapons inside their trucks and that he informed his employees of such.

Mr. Davis confirmed that his trucks were not equipped with GPS or electronic logging devices. Employees were required to maintain their own log books. Mr. Davis was shown the Defendant's log books, which reflected the following details. On May 1, 2007, the Defendant wrote that he travelled from Albion, Illinois, to Effingham, Illinois, to Nashville, Tennessee, and then to Crab Orchard, Tennessee. On June 5, 2007, the Defendant wrote that he had traveled from Goldsboro, North Carolina, to Mebane, North Carolina, and then to Pioneer, Tennessee. On June 6, 2007, the Defendant wrote that he had traveled from Pioneer, Tennessee, to Indianapolis, Indiana, and then to Freemont, Indiana. On June 7, 2007, the Defendant wrote that he had undergone a vehicle inspection in Freemont, Indiana; that he had unloaded in Kalamazoo, Michigan; that he had loaded in Albion, Indiana; that he had gotten fuel in Daleville, Indiana; and that he had gone to the sleeping compartment in Kentucky. Mr. Davis confirmed that the Defendant's logs were written by the Defendant and that there was no way to confirm that the Defendant had actually traveled the route he logged. Moreover, drivers were given discretion about which routes to take.

Mr. Davis was also shown a trip report for the Defendant's trip beginning on June 4th in Goldsboro, North Carolina, and ending on June 7th of 2007, in Kalamazoo, Michigan. When the Defendant started the trip, the truck's odometer read 787,675 miles, and when he finished, it read 789,064. In the trip report, the Defendant also wrote down the routes he took, along with mileage for those routes.

According to Mr. Davis, it was not uncommon to find a lot of mistakes or falsehoods in a driver's log books. In fact, Mr. Davis indicated that he had previously disciplined the Defendant for log violations on three occasions, one such violation occurring on April 30, 2007. The Defendant's discipline report, as well as his logs and trip report, were entered into evidence.

TBI Agent Patrick Ihrie, of the DNA and serology unit, testified that he received a blood sample from the victim and compiled her DNA profile. TBI Agent Michael Turbeville was also a DNA analyst and had worked alongside Agent Ihrie. Agent Ihrie confirmed that the blood on the blue tarp cut from Mr. Pesnell's truck was indeed the victim's. Agent Ihrie examined a "food box from [the] crime scene," and while "presumptive tests indicated the presence of blood," results were ultimately inconclusive. Agent Turbeville confirmed that the DNA sample obtained from the cigarette butt found at the crime scene, as well as the vomit nearby, was tested against the DNA profiles of

the Defendant, Mr. Sanders, Mr. Powell, and Mr. Kiem and did not match. Any identifiable blood from the crime scene was found to be the victim's.

In addition, Agent Ihrie received the samples from the victim's sexual assault kit. Semen was present on the vaginal swab, but it was not a match for the Defendant's DNA profile. Agent Ihrie noted that semen may not always be present if a condom was used.

Agent Scott assisted in collecting evidence from the Defendant's truck after it was impounded. Agent Scott testified that inside the truck, he found condoms, including an opened condom, four individual .22-caliber cartridge cases, and a Remington Speedmaster Model 552 .22-caliber rifle. A yellow notepad found in the truck had a note that read, "4-sex ok." Knives, black tape, electrical tape, latex gloves, and razor blades were also found in the truck.

Agent Scott examined the .22-caliber rifle found in the Defendant's truck with the bullets recovered by the medical examiners from the victim and Ms. Hulbert. Agent Scott began by test-firing the rifle, and he found "[a]pproximately six inches or so down the inside barrel of the gun, . . . a ring of rust inside the barrel." Agent Scott opined that the ring of rust "was a serious consideration for" him "because rust inside the barrel of a firearm would overmark or overwrite over the bullets that come down its barrel." Initially, he could not match either bullet to the rifle due to the overmarking caused by the rust present. He could not date the rust. Agent Scott then cleaned the firearm and removed most of the rust, although cleaning it "did not completely remove the overmarking." Agent Scott test-fired more bullets to obtain new bullet markings for comparison.

Agent Scott compared the newly test-fired bullets to the two bullets from Ms. Hulbert and the victim. Agent Scott testified that he compared Ms. Hulbert's bullet first because it "was the more whole bullet." From his comparison, he concluded that the bullet from Ms. Hulbert was fired through the Defendant's rifle. He "was not able to identify the [victim's] bullet directly to the [Defendant's] rifle." Agent Scott explained that "[t]he damage to the [victim's] bullet had an impact on whether [he] could compare it directly to test bullets from the rifle which had been overmarked by the rust that was inside the barrel of the gun." However, "he stood by [his] identification of the [victim's] bullet to the Hulbert bullet[.]" A sketch of how he matched the markings on the two bullets was entered into evidence.

Agent Scott also concluded that three of the four cartridge casings found inside the Defendant's truck were fired from the Defendant's rifle. The fourth casing did not have enough individual characteristics for Agent Scott to conclusively identify it, but he could not exclude the casing from having been fired by the rifle.

Agent Scott's conclusions were confirmed by a second examiner. In addition, according to Agent Scott, it was "a practical impossibility that two different weapons would make the same marks." Nonetheless, Agent Scott was asked about the possibility of bias occurring in the field of firearm and tool mark comparison. He affirmed that Sergeant Postiglione informed him of the similar circumstances of these two cases, as well as Sergeant Postiglione's telling him that it was possible there was a "third case from Alabama." Agent Scott indicated that he test-fired additional bullets in case other victims were found.

TBI Agent Kendra Fleenor was qualified by the trial court as an expert in the field of latent print comparison. Agent Fleenor examined multiple items of evidence in this case. She had received the fingerprints of the Defendant, Mr. Sanders, Mr. Powell, and Mr. Kiem for comparison. Twenty-five of the prints taken from items found inside the truck matched the Defendant's prints. Only one identifiable print was observed on the Defendant's rifle, and it matched the Defendant. Agent Fleenor was not able to match any of the remaining prints lifted from items inside the truck to Mr. Kiem, Mr. Powell, or Mr. Sanders.

Agent Fleenor also received items from the crime scene in Lebanon, including the items of trash placed on the victim's back. She was able to obtain an identifiable fingerprint on one of the beer cans from inside the plastic bag; it was not a match for the Defendant. She was also able to obtain an identifiable palm print from one of boxes found inside the plastic bag, but it did not match the Defendant's either. On the Taco Bell food box, Agent Fleenor was able to identify two latent fingerprints, one belonging to the Defendant and the other to an unknown individual. According to Agent Fleenor, the fingerprint was from the Defendant's right little finger. She did not compare the prints found on the items from the Lebanon crime scene to the prints of Mr. Kiem, Mr. Powell, or Mr. Sanders.

Agent Fleenor testified that there were three basic fingerprint pattern types: loops, arches, and whorls. When asked to identify the "level-one detail" she observed in the Defendant's fingerprint on the Taco bell box, Agent Fleenor stated that she was able to "see the top part of the core, which is the center part of the pattern type." She was able to observe a "right-slant loop" in the print. Agent Fleenor stated that approximately sixty-five percent of the population have a loop pattern, which included the Defendant. She was also able to confirm "level two detail" in the Defendant's print on the box. Finally, Agent Fleenor's finding was confirmed by another analyst.

Agent Fleenor confirmed that there were "not a minimum number of points required" in order to make a fingerprint comparison. She admitted that unintentional errors in identification could occur, typically involving a "low quality latent print." In her opinion, most errors occurred when the examiner had seen the known impression first

before comparing it to the latent print. Agent Fleenor cited to a study that she had read, which indicated "that the error rate for erroneous identification . . . was .1 percent." According to Fleenor, the field of latent fingerprint identification did not currently "use models in latent examination."

The final jury instructions are not included in the record on appeal. However, the trial court indicated that it intended to again charge the jury on how to use "evidence of other crimes, wrongs, or acts." The trial court commented that it would charge Tennessee Pattern Jury Instruction 42.10 and would insert the purposes for which the evidence could be considered, those being, "complete story of the crime, identity, scheme plan, motive, [and] intent," but not "guilty knowledge." Following the conclusion of the proof, the Defendant was convicted as charged of the victim's murder and abuse of her corpse.

### 3. Sentencing and Appeal

The trial court imposed a life sentence for the murder conviction. At the August 7, 2018 sentencing hearing that followed, the trial court sentenced the Defendant to two years for the abuse of a corpse conviction. In addition, the trial court ordered that the two sentences in this case be served consecutively to one another, as well as consecutively to the Davidson County sentences of life for the murder conviction and thirty years for the solicitation convictions, resulting in an effective sentence of two life terms plus thirty-two years. After denial of the Defendant's timely motion for new trial, this appeal followed.

### ANALYSIS

### I. *Issue Preclusion*

On appeal, the Defendant maintains that the trial court erred by applying the law of the case doctrine and the doctrine of collateral estoppel to preclude him from raising his constitutionally-based suppression issues regarding the search of his truck and his statements. The Defendant notes that he was prevented from having the trial court of another jurisdiction render "its own assessment of witness credibility and weighing of the evidence in order to make its own findings of fact[s] and rulings of law as to what evidence . . . the law enforcement officers in this case obtained" in violation of his constitutional rights. The State argues that the trial court did not err by applying the doctrine of collateral estoppel because the Defendant's threshold constitutional issues concerning admissibility had "already been determined in two prior actions."

The law of the case doctrine prevents the reconsideration of claims that have been decided in a prior appeal of the same case. See State v. Jefferson, 31 S.W.3d 558, 560

(Tenn. 2000). "[U]nder the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the <u>same</u> as the facts in the first trial or appeal." <u>Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.</u>, 975 S.W.2d 303, 306 (Tenn. 1998) (emphasis added); <u>see also</u> <u>Jefferson</u>, 31 S.W.3d at 560-61. This doctrine "applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication," but the doctrine does not apply to dicta. <u>Memphis Publ'g. Co.</u>, 975 S.W.2d at 306. The doctrine "is not a constitutional mandate nor a limitation on the power of a court" but "is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited." <u>Id.</u> (citations omitted). Application of the doctrine promotes finality, efficiency, consistent results, and obedience to appellate decisions. <u>Id.</u>

The law of the case doctrine, however, is distinct from the doctrine of collateral estoppel. "The law of the case and collateral estoppel are different in that collateral estoppel prevents the relitigation of issues in successive suits between the same parties; the law of the case prevents relitigation of the same issues within successive stages of the same suit." <u>State v. Scarbrough</u>, No. E2003-02850-CCA-R9-CD, 2004 WL 2280423, at *4-5 (Tenn. Crim. App. Oct. 11, 2004) ("Scarbrough I"), <u>aff'd</u>, 181 S.W.3d 650 (Tenn. 2005) (quotation omitted). Here, the trial court never specifically relied on the law of the case doctrine in rendering its ruling, stating only that the State's motion asserting the law of the case and collateral estoppel doctrines was "well-taken." During its oral ruling from the bench, the trial court relied only on collateral estoppel as the basis for its decision. Moreover, the State does not reference the law of the case doctrine in its argument on appeal. We agree with the Defendant that the law of the case doctrine is inapplicable and will turn our attention to the doctrine of collateral estoppel.

Collateral estoppel, also called "issue preclusion," is a doctrine of judicial economy utilized to prevent costly relitigation of the same issues, conserve judicial resources, and encourage reliance on judicial conclusions. <u>See</u> <u>Gibson v. Trant</u>, 58 S.W.3d 103, 113 (Tenn. 2001); <u>Beaty v. McGraw</u>, 15 S.W.3d 819, 824 (Tenn. Ct. App. 1998). Collateral estoppel "bars the same parties or their privies from relitigating in a later proceeding legal or factual issues that were actually raised and necessarily determined in an earlier proceeding." <u>Mullins v. State</u>, 294 S.W.3d 529, 534 (Tenn. 2009) (citations omitted). The Tennessee Supreme Court summarized the law of collateral estoppel in <u>Mullins</u>:

> The party invoking collateral estoppel has the burden of proof. To prevail with a collateral estoppel claim, the party asserting it must demonstrate (1) that the issue to be precluded is identical to an issue

- 31 -

decided in an earlier proceeding, (2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding, (3) that the judgment in the earlier proceeding has become final, (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded.

Moreover, in order for the doctrine of collateral estoppel to apply, the issue must not only have been actually litigated and decided, it must also have been necessary to the judgment. Determinations of an issue or issues that are not necessary to a judgment have the characteristics of dicta and will not be given preclusive effect.

294 S.W.3d at 535 (citations and footnote omitted). The question of whether collateral estoppel applies is a question of law. Id.

The doctrine of collateral estoppel, as used offensively by the State, has been applied infrequently in criminal cases on direct appeal. See State v. Michael Rimmer, No. W2017-00504-CCA-R3-DD, 2019 WL 2208471 (Tenn. Crim. App. May 21, 2019) (noting the infrequency and deciding to address the issue on the merits), WILL HAVE PERM APP FILED DD. The Tennessee Supreme court held in State v. Scarbrough, 181 S.W.3d 650, 652 (Tenn. 2005) ("Scarbrough II"), that the Tennessee Constitution does not permit the prosecution to use collateral estoppel against the defendant in order to establish an essential element of the offense; an affirmance of this court's holding in Scarbrough I reaching the same outcome. However, this court, in rendering its decision in Scarbrough I, provided examples of courts allowing collateral estoppel to be used against a criminal defendant in other situations, such as in cases involving alienage, status, and suppression issues. See 2004 WL 2280423, at *9-12. In particular regarding suppression cases, the Scarbrough I court noted the following:

[P]rosecutors have used offensive collateral estoppel to prevent defendants from contesting motions to suppress evidence where judges in prior cases had determined that the evidence was admissible. See, e.g., United States v. Levasseur, 699 F.Supp. 965 (D. Mass.), rev'd on other grounds, 846 F.2d 786 (1st Cir. 1988); State v. Hider, 715 A.2d 942, 945 (Me. 1998) (in second trial, after reversal of first conviction, collateral estoppel doctrine barred defendant from relitigating suppression issue); Richard B. Kennelly, Jr., Precluding the Accused: Offensive Collateral Estoppel in Criminal Cases, 80 Va. L.Rev. 1379, 1384-86 (1994). Moreover, our supreme court has suggested that such applications of collateral estoppel might be

acceptable: "While collateral estoppel likely could be applied in this circumstance [to give preclusive effect to a prior suppression decision], having thoroughly reviewed the entire record, we choose to address the defendant's contention on its merits." State v. Flake, 114 S.W.3d 487, 507 (Tenn. 2003).

Id. at *11.

Nonetheless, our supreme court in Scarbrough II distinguished Flake as follows: "In sum, the issue in Flake did not involve the State's use of collateral estoppel to prevent the re-litigation of the essential elements of a charged offense, and the court's statement was dicta that is in no way controlling in this case." 181 S.W.3d at 655 n.3. The rationale underlying the court's holding in Scarbrough II—that the prosecution may not invoke the doctrine of offensive collateral estoppel to establish an essential element of a charge in a criminal case—placed emphasis on the defendant's right to a jury trial, specifically that such right "include[d] the right to have every fact tried and determined by twelve jurors and to have all issues of fact submitted to the same jury at the same time." 181 S.W.3d at 658 (quotation omitted). The Scarbrough II court further reasoned that the interests of "efficiency and judicial economy . . . [were] illusory when applied to the circumstances" of that case because the State was still required to present proof of the underlying felony regardless of whether the doctrine of collateral estoppel was applied. Id. The court concluded, "As a result, the use of collateral estoppel would not achieve efficiency or judicial economy and would serve only to imperil the defendant's right to a trial by jury in this proceeding." Id.

Neither of the interests present in Scarbrough II are pervasive here, and we find the circumstances of this case to be more aligned with the statement from our supreme court in Flake that the doctrine's application may be appropriate in some criminal cases. These initial threshold constitutional suppression issues presented by the Defendant in his motions are pretrial matters for the judge's determination and do not involve the jury or usurp their role as fact-finder. The Defendant does not claim that he sought to introduce different evidence or make new legal claims but rather that he should be permitted to retry the matter in another jurisdiction before a different trial judge. Twice these issues have been raised, litigated, and affirmed on appeal. See Mendenhall, 2013 WL 430329, at *14-16; Mendenhall, 2013 WL 360525, at *44-49. Our supreme court has denied permission to appeal, and the judgments have become final. Likewise, there is no question that the issues were necessary to the judgments.

Moreover, the issues are identical to those presented in the Davidson County cases; all cases involving the Defendant and felony crimes for which he was charged. While "finality and conservation of private, public and judicial resources are" of lesser value in criminal cases than in civil litigation, see Ashe v. Swenson, 397 U.S. 436, 464

- 33 -

(1970) (Burger, C.J., dissenting), they are not completely inconsequential. The Defendant, represented by counsel, had a full and fair opportunity to be heard. Because the motions and the evidence were identical, the interests of efficiency and judicial economy are promoted by preclusion. The trial court did not have to conduct additional hearings, which would require the presence of all parties and the presentation of evidence, including subpoenaing witnesses.

We also note that the trial court did not preclude all of the Defendant's suppression issues, only those threshold issues of admissibility that had been previously determined and that were not fact specific to each individual case. The Defendant was still permitted to make evidentiary-based arguments; in fact, an extensive hearing was held on the subject on February 1, 2018, despite his assertions to the contrary. In addition, nothing here seems to suggest that the prosecution brought separate prosecutions for strategic or bad faith reasons. Accordingly, we hold that the trial court properly determined that the Defendant was collaterally estopped from relitigating his suppression motions raising threshold constitutional issues of admissibility.

## II. *Other-Acts Evidence*

The Defendant argues that the trial court erred in admitting evidence of crimes besides those offenses for which he was being tried, those other crimes being evidence related to the Davidson County murder and solicitation cases, references to other out-of-state killings in his police statement, and recordings made by the jailhouse informant.[5] The Defendant also argues that even if his police statement was admissible, it should have been redacted to exclude impermissible references to other crimes or bad acts of the Defendant. The State responds that the trial court properly admitted the evidence.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). "The admissibility of evidence under Rule 403 of the Tennessee Rules

---

[5] The Defendant makes multiple references in his argument to the State's introduction of evidence of his prior convictions from the two Davidson County cases. However, we can find no evidence in the record that his actual convictions or evidence of the jury's verdicts of guilt were presented to the jury. His complaint seems to be with the same proof from those cases being admitted in this case.

of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)).

Tennessee Rule of Evidence 404(b) generally prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." State v. Jones, 450 S.W.3d 866, 891 (Tenn. 2014). Rule 404(b) allows such evidence in limited circumstances for purposes other than proving action in conformity with a character trait. Id. The rule sets out certain procedural requirements the trial court must follow:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

The comments to Rule 404(b) provide that evidence of other crimes, wrongs, or acts should be excluded unless relevant to an issue other than the character of the defendant, such as identity, motive, intent, or absence of mistake. Tenn. R. Evid. 404, Advisory Comm'n cmt; see also Jones, 450 S.W.3d at 891. In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background evidence or to complete the story. State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." DuBose, 953 S.W.2d at 652.

The trial court in this case substantially complied with the procedural requirements of Rule 404(b); therefore, we will review its decisions for an abuse of discretion. As noted above, the trial court (1) held a pretrial hearing on the Defendant's motion to exclude the evidence; (2) found that evidence was admissible for the purposes of

contextual background, to complete the story, to establish the Defendant's identity, to prove a common scheme or plan, and to show the Defendant's motive and intent; (3) found that the other crimes, wrongs, or acts were established by clear and convincing evidence; and (4) found that the probative value of the evidence was not outweighed by the danger of unfair prejudice. In addition, the trial court gave numerous instructions to the jury on how it was to consider this evidence, and juries are presumed to follow the trial court's instructions. See State v. Walker, 910 S.W.2d 381, 397 (Tenn. 1995).

1. Davidson County Murder. The Defendant argues that the trial court erred by allowing the State to present proof of Ms. Hulbert's murder and evidence from her trial to establish his guilt in this case. The Defendant contends that the evidence from Ms. Hulbert's trial was not admissible to complete the story, provide contextual background evidence, establish his identity, prove a common scheme or plan, or to show his motive or intent; all of which purposes were found by the trial court in its decision to admit the evidence. In addition, according to the Defendant, the similarity of the two offenses had significant prejudicial impact on the jury's decision in this case; the Defendant notes the strength of the proof in the Davidson County case that the Defendant killed Ms. Hulbert in his prejudicial analysis. Finally, the Defendant submits that the trial court should have redacted his formal police statement to exclude all references he made to other murders in both Davidson County and out-of-state.

The Defendant's argument does not discuss the precise nature of the proof from the Davidson County murder case which he seeks to foreclose. The Defendant's allegations mainly center around his formal police statement; however, we observe that proof from the Davidson County murder case also included crime scene information secured from the TA truck stop where Ms. Hulbert's body was found and testimony from Agent Scott regarding tool mark and firearms examination of the bullets and the Defendant's rifle.

Recognizing that events "do not occur in a vacuum, and in many cases, knowledge of the events surrounding the commission of the crime may be necessary for the jury to 'realistically evaluate the evidence,'" our supreme court created a three-part test for determining when evidence of other bad acts may be offered as contextual background evidence under Rule 404(b). See Gilliland, 22 S.W.3d at 272 (citing Albrecht v. State, 486 S.W.2d 97, 100 (Tex. Crim. App. 1972)). Our supreme court stated the three-part test as follows:

> [W]hen the [S]tate seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the [S]tate must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the [S]tate's presentation of its case; (2) the void created by the absence of the

- 36 -

evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

Id. at 272 (emphasis added).

The Defendant complains that the evidence regarding Ms. Hulbert's murder and the out-of-state murders failed to satisfy the Gilliland test. However, the Gilliland test is applicable only when the State seeks to introduce the evidence for the sole purpose of establishing contextual background. See State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). Here, the trial court ruled that the evidence was admissible to establish motive as well as to provide contextual background to the jury. The trial court instructed the jury that the evidence could be considered for purposes of providing contextual background as well as proving motive and intent. As our supreme court has noted, "[e]vidence proving motive necessarily serves the purpose of completing the story of the crime." Id. When evidence is "offered and properly admitted to show motive," and motive is a material issue in the case, then a jury instruction on contextual background evidence is "superfluous." Id. The Defendant's complaint that the evidence does not satisfy the Gilliand test is misplaced, and the proper inquiry is whether the evidence was admissible to establish the Defendant's motive in this case. See, e.g., Mendenhall, 2013 WL 360525, at *62 (holding same).

Simply put, motive "is the reason why someone did a particular act" and "may provide the driving force that led the accused to commit the crime being tried." Mendenhall, 2013 WL 360525, at *62 (citation omitted). The motive of a defendant in the commission or attempt of a murder is "almost always [a] critical issue[]." State v. Gentry, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993).

Regarding motive and intent, the Defendant made references to multiple murders of prostitutes at truck stops in his police statement, including specifics about the Nashville murder and his positioning of the victim's body. He asserted that Mr. Kiem, Mr. Powell, and Mr. Sanders randomly appeared at truck stops along his routes, using his rifle and truck to have sex with prostitutes before murdering them. While the Defendant claimed he was not in Lebanon when the victim was murdered, he referenced the correct Pilot truck stop where the victim's body was found, and he confirmed that he saw blood in his truck after these men appeared at that location. Both police departments worked together believing they were dealing with the same killer, and subsequently, the Defendant was apprehended by Sergeant Postiglione and Detective Freeman. The MNPD officers were responsible for the initial search of the Defendant's truck that culminated in his arrest. These same officers interviewed the Defendant, while Detective Whitefield observed. The Defendant's employer said that the Defendant claimed to shoot

"lot lizards"; and the Defendant, speaking with Mr. McLaughlin, described Ms. Young's daughter as "a hooker, too," that frequented truck stops.

Furthermore, in order to establish the Defendant's rifle as the murder weapon, the State needed to present evidence of the comparison of the bullet removed from the victim's head with the bullet removed from Ms. Hulbert's head. Agent Scott was able to conclusively state that both bullets were fired through the same rifle and that Ms. Hulbert's bullet was fired through the Defendant's rifle, thus, establishing that the victim was shot in the head with the Defendant's .22 rifle.

Absent evidence regarding Ms. Hulbert's murder and the Defendant's statement to police about that murder, the Defendant's actions and statements would have appeared to be random and would have likely caused significant jury confusion. Accordingly, we conclude that the trial court did not err in admitting the evidence of Ms. Hulbert's murder in order to establish the Defendant's motive for killing prostitutes like this victim, and by extension, to provide contextual background to the jury. See Mendenhall, 2013 WL 360525, at *62-63 (reaching similar conclusion in the Davidson County solicitation case).

While only one purpose other than propensity is necessary to satisfy admission under Rule 404(b), the trial court also found that the murders of the victim and Ms. Hulbert were sufficiently similar to prove identity. Moreover, the Defendant devotes a substantial portion of his argument on appeal addressing this finding.

When the State offers proof that a defendant committed crimes other than the one on trial as evidence of the defendant's identity as the perpetrator, "the modus operandi of the other crime and of the crime on trial must be substantially identical and must be so unique that proof that the defendant committed the other offense fairly tends to establish that he also committed the offense with which he is charged." Bunch v. State, 605 S.W.2d 227, 230 (Tenn. 1980).

> [M]ere similarity in the manner in which two crimes are committed does not produce the relevance necessary for admission—uniqueness does. For not only must the offenses have been committed similarly, but they must also have been committed in a unique and distinctive manner. Obviously, the more unique and distinctive the methods, the more appropriate is the inference. The converse also obtains: that is, the less unique and distinctive the methods, the less appropriate the inference.

State v. Roberson, 846 S.W.2d at 280 (Tenn. Crim. App. 1992). "Although offenses may be similar in many respects, 'they cannot be classified as signature crimes if they lack a distinct modus operandi.'" State v. Toliver, 117 S.W.3d 216, 229 (Tenn. 2003) (quoting State v. Shirley, 6 S.W.3d 243, 248 (Tenn. 1999)). To be admissible, "the offenses need

not be identical in every respect," Shirley, 6 S.W.3d at 248 (citing Bunch, 605 S.W.2d at 231), but "the methods used in committing the offenses must have 'such unusual particularities that reasonable men can conclude that it would not likely be employed by different persons.'" Shirley, 6 S.W.3d at 248 (quoting Harris v. State, 227 S.W.2d 8, 11 (Tenn. 1950)). "[T]he applicable standard focuses on the distinctiveness of the crimes, not a mere assessment of similarities or an existence of rarity." State v. Jones, 450 S.W.3d 866, 895 (Tenn. 2014) (citing Roberson, 846 S.W.2d at 280).

When assessed under the appropriate standard, it is clear that the methods used in the murders of both the victim and Ms. Hulbert are indeed quite similar—the victims were both prostitutes, their nude bodies were left at truck stops, the victims were both shot in the head with the same caliber bullet, and both appeared to have something placed around their heads prior to their disposal. But, none of these "are so unique that they may be said to bear the stamp or imprimatur" of a single individual. Shirley, 6 S.W.3d at 249. However, we believe the "signature" or "imprimatur" here was the manner in which the Defendant positioned the bodies. This was so unusual or distinct "that reasonable people would conclude that the same person committed" both offenses. Id.; see also State v. Davis, 706 S.W.2d 96, 100 (Tenn. Crim. App. 1985).

Regarding the positioning of Ms. Hulbert's body, the officers described that she was lying nude on her back, with the bottoms of her feet pushed together and forward, and her knees "were spread out to the side" exposing her vagina to anyone that walked by. Here, the naked victim was "set straight down in, feet first," into the garbage can, leaned forward with her head hanging off to the side. Items of garbage were placed on her back. The posing of both bodies was indicative of some sort of deranged social commentary from the Defendant about his beliefs concerning these women and their vocation. He claimed he "just shoots" "lot lizards." The Defendant took extraordinary steps to display the victims in a very demeaning manner; it is this display that makes these crimes unique to this Defendant. When combined with the numerous other similarities between the two crimes in terms of their location, the type of victim chosen, and the manner in which the murders were committed, we simply cannot conclude that the trial court abused its discretion by concluding that the methods used to commit the crimes were sufficiently similar to permit the admission of evidence of Ms. Hulbert's murder pursuant to Rule 404(b). See, e.g., State v. Guy L. Hines, No. E2012-02456-CCA-R3-CD, 2013 WL 5940634, at *8 (Tenn. Crim. App. Nov. 5, 2013) (holding that the trial court did not abuse its discretion in admitting evidence of another assault because the perpetrator involved in both assaults "utilized a bicycle as his means of locomotion and attacked women working alone at their place of business in broad daylight," combined with the numerous other similarities between the two crimes, was "sufficiently peculiar to peak the interest of a reasonable person").

2. Out-of-State Bad Act Evidence. Relative to the Defendant's argument regarding redaction of his police statement to exclude references to the out-of-state bad act evidence, the Defendant again makes a collective argument regarding this evidence, making no specific argument about each additional out-of-state instance. We observe that the Defendant referenced four other specific incidents in his statement besides the Davidson and Wilson County offenses—Indianapolis, Birmingham, Atlanta, and Lake Station.

The Defendant told Sergeant Postiglione that the blood underneath his fingernails at the time of his arrest was from cleaning up after a killing perpetrated by Mr. Kiem and Mr. Powell the night before in Indianapolis. The Defendant said that after going inside a Flying J truck stop to eat, he returned to his truck and found these two men sitting in his truck and "blood all over the place." The Defendant saw a nude "dead girl" that had been shot in the head, and she had a bag over her head. The Defendant indicated that the blood found inside his truck came from the Indianapolis victim.

The Defendant also claimed that while in Birmingham, Alabama, he went inside a Pilot truck stop and returned again to find Mr. Kiem and Mr. Powell inside his truck. The Defendant claimed that on this occasion, his rifle went missing but that it was somehow later mysteriously returned to him. The Defendant said that "he suspected something happened" on this occasion.

Detailing an incident in Atlanta, Georgia, the Defendant said that Mr. Kiem and Mr. Powell found him at a truck stop in Louisville, Kentucky, and that they forced him to let them ride with him to Atlanta. According to the Defendant, once at a truck stop in Atlanta, the two men left with the Defendant's rifle and returned sometime later. Although the Defendant could not remember if the two men took his electrical tape from his truck when they left on this occasion, the Defendant indicated that one roll of tape from his truck did go missing at some point.

Finally, the Defendant detailed an incident in Illinois where he emerged from a truck stop in Lake Station, Illinois, to find his rifle missing from his truck. The Defendant claimed that he saw Mr. Powell across the street and that Mr. Powell said, "Oh we're up here having a little fun"; that Mr. Keim then drove up in Mr. Kiem's truck and threw the Defendant's rifle at him; and that Mr. Kiem asserted that they would not get into trouble because there were no fingerprints on the rifle. The Defendant told Sergeant Postiglione that he later heard over the CB radio that a body had been found in Lake Station, Illinois.

The Defendant claimed in his police statement that Mr. Kiem and Mr. Powell "did it all the time," and the Defendant later implicated Mr. Sanders. However, the Defendant offered no explanation for how these men were able to get inside his truck on these

occasions. The Defendant indicated to Sergeant Postiglione that seven women had been murdered in total and that it was possible DNA evidence from each of these victims may be found inside his truck. The Defendant averred that he had to follow instructions from these men because they threatened his daughters.

At the February 1, 2018 hearing, the trial court found that these out-of-state crimes, if "label[ed]" as such, had been established by clear and convincing evidence relying on the Defendant's admissions in his police statement. The trial court also determined that admission of this evidence was not prohibited by Rule 404(b) because it was "part of the overall picture here" to "complete [the] story."

At the hearing on February 13, 2018, approximately two weeks before trial, the trial court stated that it would revisit the issue if presented with evidence of how the statement could be redacted so as not to confuse the jury. However, the record is silent whether defense counsel ever raised the issue of redacting the statement again. Because it does not appear from the record that this issue was revisited, the Defendant has waived our consideration of the issue. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

Waiver notwithstanding, we cannot say on the record before us that the trial court erred by admitting the evidence to provide contextual background to the jury. See Mendenhall, 2013 WL 360525, at *62-63. Although the Defendant claimed that he did not commit these other murders, he implicated himself in the killings and coverup, stating that it was possible DNA evidence could be found in his truck from each victim he mentioned during the interview. He also provided relevant details in his descriptions of the other instances, such as electrical tape and Mr. Kiem's alleged ability to drive a vehicle. The Defendant admitted to having blood from the Indianapolis victim under his fingernails at the time of his arrest. The Defendant further admitted to covering up for these men, though claiming that he did so under duress.

The trial court found that it would be non-sensical to redact the Defendant's police statement to exclude references to the bad act evidence from other states. Again, we observe that motive and intent were material issues and that exclusion of these references from the Defendant's police statement would have given the appearance that the Defendant's actions were committed at random and would have likely caused significant jury confusion. Accordingly, we conclude that the trial court did not err in admitting this evidence in order to establish the Defendant's motive for killing prostitutes like this victim, and by extension, to provide contextual background to the jury. See Mendenhall, 2013 WL 360525, at *62-63 (reaching similar conclusion in the Davidson County solicitation case). In addition, because we conclude that evidence of Ms. Hulbert's

- 41 -

murder and proof from the solicitation case was properly admitted (as discussed below), and because the trial court issued multiple instructions to the jury on how it was to consider such evidence, any error in the admission of the Defendant's references to the out-of-state incidents was harmless.

3. <u>Solicitation Proof</u>.  The Defendant submits that the proof from the solicitation case was relevant "in the Davidson County homicide because the Defendant believed the targets of the solicitations were conspiring to have the Defendant convicted of the murder in Davidson County," and for that same reason, "[t]he solicitations have no relevance to the Wilson County case."  The Defendant further submits that the probative value of such evidence was not outweighed by its prejudicial effect on the jury.  We note that the Defendant's allegations of error regarding admission of proof from the Davidson County solicitation case touch on three different areas—his presentation of an alibi defense, testimony regarding his solicitation of Mr. McLaughlin to commit the murders, and the recordings themselves.

During the car ride to the homicide office, the Defendant first implicated Mr. Kiem and Mr. Powell as the responsible parties for the murders.  In the Defendant's formal statement to Sergeant Postiglione and Detective Freeman, he again implicated Mr. Kiem and Mr. Powell and, towards the end of his interview, Mr. Sanders.  According to both Sergeant Postiglione and Detective Freeman, these three men, as well as Mr. Kiem's mother who served as his legal guardian, were cooperative.  DNA and fingerprint samples were collected, and they were unable to find any evidence that these three individuals participated in these crimes, as the Defendant claimed.

Also, the Defendant gave notice of alibi, stating that he intended to introduce his log books to establish his alibi at trial.  At trial, the log books were introduced in an effort to prove the Defendant was not near Lebanon when the victim was murdered.

While the Defendant was incarcerated, Sergeant Postiglione received information that the Defendant was trying to solicit Mr. McLaughlin "to kill some witnesses so they could not testify against [the Defendant] at trial."  Thereafter, the police recorded two conversations between the Defendant and Mr. McLaughlin, and those recordings were played for the jury.  In the recordings, the Defendant noted his need for an alibi, and he agreed to pay $15,000 in exchange for having Mr. Kiem, Ms. Young, and Mr. Powell killed.  The Defendant indicated that he would contact Mr. McLaughlin's uncle to repay his debt.  In addition, the Defendant referred to Ms. Young's daughter's being "a hooker too, that goes to the three truck stops up there in Anderson."

Ms. Young, Mr. Powell, and Mr. Sanders all testified at the Defendant's trial in this case.  They provided details reflecting that none of these three men were involved in the murders of the victim or Ms. Hulbert.

- 42 -

"Any attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred." State v. Maddox, 957 S.W.2d 547, 552 (Tenn. Crim. App. 1997) (quoting Tillery v. State, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978)). "Generally, evidence of threats against witnesses attributed to the accused is probative as being either (1) conduct inconsistent with the accused's claim of innocence or (2) conduct consistent with the theory that the making of such threats evinces a consciousness of guilt." State v. Austin, 87 S.W.3d 447, 477 (Tenn. 2002) (appendix).

The trial court, specifically, in its order denying the Defendant's motion for new trial, affirmed its ruling that the recordings from Mr. McLaughlin were admissible. The trial court reasoned as follows:

> The court does note that recordings of the [D]efendant['s] talking to a jailhouse informant were properly admitted at the trial. In these jailhouse recordings, the [D]efendant denied seeing Richard Kiem in "years." Richard Kiem was one of the persons the [D]efendant had told law enforcement had committed the murders, which occurred only months earlier. The recordings also bore out a plan by the [D]efendant to kill State witnesses in order to prohibit them from being able to testify against him at trial. Evidence of an attempt to destroy or conceal evidence is relevant to the guilt of the accused.

We agree.

The recordings were admissible to discredit the Defendant's alibi defense, as well as to reflect the Defendant's consciousness of guilt. The Defendant claimed at trial that his log books established his whereabouts when the victim was murdered and that he was not in Lebanon on the day in the question. In addition, the Defendant told Sergeant Postiglione that he did not commit these murders but that these other three men were in fact the perpetrators. The Defendant made several attempts to obtain an alibi. The recordings established that the Defendant believed the testimony of these three individuals to be a threat to his chances of acquittal on these and other charges, and as such sought to have them killed prior to trial in an effort to suppress their testimony. In addition, the Defendant's statement about Ms. Young's daughter's being "a "hooker too," who frequented truck stops, provided circumstantial evidence of the Defendant's motive. For all these reasons, the proof was admissible. See, e.g., Mendenhall, 2013 WL 430329, *19 (reaching a similar conclusion regarding admission of the solicitation case proof in the Davidson County murder prosecution).

The Defendant's argument hinges on the fact that he believed these witnesses were conspiring to have him convicted of only the murder in Davidson County. However, the

record does not support his assertion in that regard. Nothing limits the relevance of this proof solely to the murder of Ms. Hulbert. The Defendant implicated these three men in all of the murders. Simply because the proof of the Defendant's solicitation to commit murder was relevant and admissible in the Davidson County murder trial does not mean it cannot likewise be relevant and admissible here.

The trial court found that a material issue existed other than this conduct conforming with a character trait and charged the jury multiple times on how it was to consider such evidence. Because this evidence revealed the Defendant's consciousness of his own guilt, disclosed his motive of killing prostitutes at truck stops, and contradicted his claim of alibi, we conclude that the recordings and proof his solicitation to commit murder were properly admissible. The trial court did not abuse its discretion by determining that the probative value of the evidence outweighed the danger of its unfairly prejudicial effect. Thus, the Defendant is not entitled to relief as to this issue. See, e.g,. State v. Damien Neely, W2010-01128-CCA-R3-CD, 2011 WL 3768918, at *14 (Tenn. Crim. App. Aug. 24, 2011) (finding that the trial court did not err in admitting recordings of phone calls wherein the defendant sought to prevent the witnesses from testifying against him because the recordings reflected the defendant's consciousness of guilt).

## III. *Continuance*

The Defendant asserts that the trial court erred by denying his motion for a continuance based upon the State's failure to turn over surveillance video from the Pilot truck stop until just weeks before trial. The Defendant cites the following circumstances in support of his argument: the Defendant "was granted two pre-trial motions which specifically requested copies of any video to be provided to" him; these recordings contained "potentially exculpatory evidence showing the Defendant was not on the Pilot property at the time of the crime"; the Defendant was not provided with "a reasonable" amount of time for "his defense team to review the videos and potentially prepare to use them in the trial"; and "[t]he [d]etective who had kept the recordings in his custody since 2007 testified during [m]otion [h]earings that he had viewed all of the recordings and did not see [the] Defendant in them on the property of the Pilot [t]ruck [s]top from June 5 through June 7, 2007." The Defendant surmises that denial of his motion to continue was not harmless error. The State responds that the Defendant has failed to demonstrate actual prejudice from the denial of his motion.

The trial court's denial of a continuance will be reversed only if it appears that the trial court abused its discretion to the prejudice of the defendant. State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004) (citing State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)). A trial court abuses its discretion when denial of a continuance deprived the defendant of a fair trial or upon showing that the result of the trial would have been different had a

continuance been granted.  Id.  A defendant asserting that the denial of a continuance constitutes a denial of due process or the right to counsel must establish actual prejudice. Id. (citing Morris v. Slappy, 461 U.S. 1, 11-12 (1983)).

The Defendant raised the trial court's denial of his motion for a continuance as an assignment of error in his motion for new trial, specifically referencing therein only the delayed disclosure of the video footage from the Pilot truck stop and not any of the other grounds argued at the hearing on the motion.  In its written order denying the motion for new trial, the trial court ruled as follows:

> The [D]efendant sought video from the Pilot [t]ruck [s]top where the body of [the victim] was discovered.  Several weeks before trial, the State discovered that the video footage from Pilot [t]ruck [s]top had been preserved, and disclosed said footage to the defense.  The defense asserted that additional time was needed to review the footage, and the [c]ourt denied the request for continuance.  The court notes that the trial had already been significantly delayed due to prior requests for continuances by the defense.  In addition, Detective Kirk Whitefield testified at the trial that there was no camera angle which depicted the area where [the victim's] body was found.  The State introduced images from every camera angle, permitting the jury to see the areas of the premises covered by camera surveillance.  Detective Kirk Whitefield also testified that he had watched all of the video footage, and that neither the [D]efendant, nor [the victim], nor the [D]efendant's truck were seen on the camera footage.  Additionally, at the motion for new trial, which occurred almost [ten] months after the trial, the [D]efendant did not produce any video footage which the [D]efendant claimed would have been helpful to the [D]efendant at trial. The [D]efendant has not established that he was prejudiced by the denial of the continuance.  This issue is without merit.

We agree with the rationale of the trial court.

This was the Defendant's fourth motion for a continuance.  The record reflects that pretrial hearings in this case began as early as April 2013, following the completion of the Defendant's murder and solicitation cases in the Davidson County Criminal Court. The trial court noted that the case was "old, old, old" and that trial had been "set now for months."  The prosecutor explained that although Detective Whitefield provided a property receipt from 2009, there was not "anything else in the file that [he] had" reflecting possession of the recordings and that he did not know of the recordings until speaking with Detective Whitefield in preparation for trial.  The prosecutor further indicated that he had already subpoenaed approximately fifteen to eighteen witnesses for

trial, that at least five to six of those were from out-of-state, and that a change in accommodations would need to be made if a continuance was granted.

Furthermore, Detective Whitefield testified at trial that he had reviewed the surveillance footage from the relevant dates and did not see the Defendant or the victim on the recordings. The angles from the recordings captured mostly inside the store and very little of the outside area of the Pilot. The Defendant did not provide any evidence at the motion for new trial hearing that more time to review the recordings would have provided any additional helpful evidence; he likewise does not argue such on appeal. Accordingly, he has not demonstrated that the denial of the continuance prejudiced him to the extent that he was denied a fair trial or that he would have received a different result otherwise. See, e.g., State v. Thomas Lee Hutchinson, No. E2012-02671-CCA-R3-CD, 2014 WL 1423240, at *34 (Tenn. Crim. App. Apr. 11, 2014) (finding no error when the defendant sought a continuance on the first day of his trial to review the prosecution's late disclosure of photographs of the defendant's clothing when the defendant had the opportunity to thoroughly cross-examine the TBI agent responsible for testing the items of clothing depicted in the photographs, and when the defendant had not asserted that he would have discovered any additional information about the photographs had he been granted a continuance), aff'd, 482 S.W.3d 893 (Tenn. 2016); State v. Malcolm H. Jones, No. E2011-02082-CCA-R3-CD, 2012 WL 6176770, at *6 (Tenn. Crim. App. Dec. 11, 2012) (affirming the denial of a motion to continue on the eve of trial asking for an opportunity to locate and interview a substantive witness when the defendant had still failed to locate the witness three months after trial and show that the witness would have provided favorable information to the defense). Therefore, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion to continue.

## IV. *Sufficiency*

The Defendant challenges the sufficiency of the evidence supporting his convictions. Specifically, the Defendant argues that the "[a]dmissible factual evidence from the scene was insufficient for a reasonable jury to conclude beyond a reasonable doubt that the Defendant accomplished a premeditated and intentional killing of another and [a]buse of a [c]orpse." According to the Defendant, "the only admissible evidence include[d] a redacted version of the interrogation, unidentifiable fragments of the bullet removed from the victim's head, and one-fourth of a little-finger print"; the Defendant surmises that this evidence alone was insufficient to support his convictions. The Defendant also mentions that no DNA evidence was found on the victim or on other evidence found at the scene. The State responds that the evidence was sufficient.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Bland</u>, 958 S.W.2d at 659; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." <u>State v. Cooper</u>, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." <u>State v. Williams</u>, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." <u>State v. Dorantes</u>, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." <u>State v. Sisk</u>, 343 S.W.3d 60, 67 (Tenn. 2011).

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

With respect to the abuse of a corpse charge, a person "without legal privilege" commits the offense by physically mistreating a corpse "in a manner offensive to the sensibilities of an ordinary person." Tenn. Code Ann. § 39-17-312(a)(1).

The State aptly notes that even if certain evidence is deemed inadmissible, this evidence is nonetheless included in the sufficiency analysis under State v. Longstreet, 619 S.W.2d 97, 101 (Tenn. 1981). See also State v. Ramie Anderson, No. M2005-02086-CCA-R3-CD, 2006 WL 2380604, at *9 (Tenn. Crim. App. Aug.17, 2006) (interpreting Longstreet as "mandat[ing] that when conducting a sufficiency of the evidence review following a finding of erroneous admission of some evidence, the appellate court should conduct the sufficiency review based on the inclusion of the erroneously admitted evidence"). However, as discussed above, we find no error in the trial court's admission of the complained-of evidence.

The evidence in this case was sufficient to prove that the Defendant solicited the victim for sex, that he shot her in the head with his .22 caliber rifle, and that he dumped her nude body in the garbage can at the Pilot truck stop in Lebanon. The victim was placed feet first into the trash can, and trash was placed on top of her. It appeared as though she had been positioned there in an effort to create an inference that she was trash.

In the trash found placed on her back was a Taco Bell box with the Defendant's fingerprint on it. The Defendant claims that Agent Fleenor testified that the "points found on the partial print could possibly be found on [sixty-five percent] of the population." In fact, Agent Fleenor testified that there are three basic fingerprint pattern types: loops, arches, and whorls and that the Defendant's fingerprint type was a "right-slant loop." Agent Fleenor stated that approximately sixty-five percent of the population

have a loop pattern; she did not testify that sixty-five percent of the population had the Defendant's actual fingerprint.

When the Defendant was apprehended the following month, the Defendant gave a police statement, in which he attempted to blame three other men for the killings and maintained that they coerced him into disposing of evidence. According to the Defendant, these three men followed him throughout his interstate travels, showing up at truck stops where he happened to stop, so that they could have sex with and murder prostitutes inside his truck and pin the murders on him. In the course of the interview, the Defendant admitted to being at the Pilot truck stop during the relevant time frame and claimed that Mr. Powell and Mr. Kiem approached him while he was there. He asserted that he went inside the truck stop, and when he returned, the two men were gone; however, the surveillance footage did not show the Defendant inside the store. The Defendant said that he suspected something might have happened while he was inside the truck stop because he found blood inside his truck on this occasion. He admitted to cleaning up the blood but professed that he did not see a body. The Defendant later implicated Mr. Sanders as well. However, Mr. Powell, Mr. Kiem, and Mr. Sanders were determined to have solid alibis. Moreover, the jury, as was its prerogative, chose not to accredit the Defendant's notations in his log that he stayed in Pioneer, Tennessee, on the evening of June 5, 2007, and was not in the vicinity of the truck stop in Lebanon.

Agent Scott testified that after comparing the bullet removed from the victim to the one removed from the Davidson County victim, he was conclusively able to state that the bullet removed from the victim was fired through the same gun as the bullet removed from Ms. Hulbert and that the bullet from Ms. Hulbert was fired by the Defendant's .22-caliber rifle. The Defendant acknowledged that he kept the gun in his truck. The Defendant's employer testified that he warned the Defendant to stay away from "lot lizards," or prostitutes, at truck stops, and the Defendant replied that he "just shoot[s]" them. The Defendant mentioned that Ms. Young's daughter was "a hooker, too" that frequented three truck stops in the Illinois area. After the Defendant was incarcerated, he sought to conceal his crimes by soliciting another inmate to kill Ms. Young, Mr. Kiem, and Mr. Powell so they could not testify against him at trial. We conclude that, from all this evidence, a reasonable juror could conclude that the Defendant murdered the victim with premeditation and abused her corpse.

### V. *Consecutive Sentencing*

The Defendant argues that the trial court erred in its imposition of consecutive sentencing; the State disagrees. A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in Tennessee Code Annotated section 40-35-115(b). "Any one of these grounds is a sufficient basis for the imposition of consecutive

sentences." State v. Pollard, 432 S.W.3d 851, 862 (Tenn. 2013) (citing State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013)). Additionally, when the imposition of consecutive sentences is based on application of the dangerous offender criterion, the court must also find "that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." State v. Wilkerson, 905 S.W.2d 938, 939 (Tenn. 1995); see also Pollard, 432 S.W.3d at 863-64; State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

Furthermore, our supreme court has held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." Pollard, 432 S.W.3d at 860. This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." Id. at 861. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. (citing Tenn. R. Crim. P. 32(c)(1); State v. Bise, 380 S.W.3d 682, 705 (Tenn. 2012)). However, when imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002).

Here, from our review of the transcript, the trial court imposed consecutive sentences at the sentencing hearing based solely upon the dangerous offender criterion: "The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" See Tenn. Code Ann. § 40-35-115(b)(4). The Defendant, nonetheless, in his motion for new trial argued that trial court erred by relying on the extensive criminal history factor in subsection (b)(2), in addition to the dangerous offender criterion. See Tenn. Code Ann. § 40-35-115(b)(2) ("The defendant is an offender whose record of criminal activity is extensive[.]"). The trial court, in its order denying the Defendant's motion, found that the extensive criminal history factor "was appropriately applied." Again, only one consecutive sentencing factor needs to exist to support the imposition of consecutive sentences.

A. Extensive Criminal History. Initially, on appeal, the Defendant argues that the trial court erred by considering his prior convictions from the Davidson County murder and solicitation cases in issuing its decision to impose consecutive sentencing in the Wilson County case because the Wilson County case occurred first in time. However,

- 50 -

the Defendant's argument focuses on the definition of prior convictions and relates to the statutes dealing with offender classification, not the statute governing consecutive sentencing. See Tenn. Code Ann. §§ 40-35-106(b) (defining prior conviction, for the purpose of sentencing a defendant as Range II, multiple offender, as "an offense occurring prior to the commission of the offense for which the defendant is being sentence); -120(e)(1) (providing instructions for determining the number of prior convictions to establish "repeat violent offender" status, using the language "before committing" a designated offense).

The trial court found that the Defendant was an offender whose record of criminal activity was extensive. In so concluding, the trial court reasoned as follows:

> Not only has the [D]efendant been convicted of a number of serious felony offenses prior to this sentencing hearing, but even if he had not, the factor does not require conviction in order for the trial court to find that the [D]efendant has extensive record of criminal activity. The court found evidence, in form of the [D]efendant's own videotaped statement, of extensive criminal activity prior to his conviction.

The trial court correctly noted that although the Defendant had in fact been convicted in the two Davidson County cases, convictions were not required for this factor to be applicable. See State v. Koffman, 207 S.W.3d 309, 324 (Tenn. Crim. App. 2006). Also, we observe that nothing in the consecutive sentencing statute requires that the offense for which the Defendant is being sentenced have occurred subsequently to the offense resulting in the prior conviction. See State v. Antwain Green, No. M2013-00167-CCA-R3-CD, 2013 WL 5783740, at *3 (Tenn. Crim. App. Oct. 28, 2013). Here, the trial court relied upon the Defendant's statement during his interview in imposing this factor; the Defendant's statements therein implicated him in multiple killings and illegal acts. Once incarcerated, the Defendant sought to solicit a jailhouse inmate to murder three of the State's witnesses. The records supports the trial court's findings, and the trial court did not abuse its discretion by applying this factor.

B. Dangerous Offender. The Defendant further submits that consecutive sentencing was unwarranted under the dangerous offender criterion in Tennessee Code Annotated section 40-35-115(b)(4). According to the Defendant, the State failed to establish, pursuant to Wilkerson, that consecutive sentencing was necessary to protect the public from further criminal acts by the Defendant. See 905 S.W.2d at 939. The Defendant explains, "Given [his] age and life expectancy, it is an almost impossible event that he would be released from confinement in the future."

Here, in classifying the Defendant as a dangerous offender, the trial court noted, first, that in the Davidson County solicitation to commit murder case, the trial judge

ordered all three ten-year sentences to be served consecutively to one another; next, that the same trial judge subsequently ran the life sentence for the Davidson County first degree murder conviction consecutively to the previously imposed effective thirty-year sentence; that both times the trial judge relied upon the dangerous offender criterion; and that the trial court agreed with the Davidson County trial judge's findings in that regard. See Mendenhall, 2013 WL 430329, at *30-31; Mendenhall, 2013 WL 360525, at *66-68. The trial court then noted that it was "necessary" for the court to consider the Wilkerson factors in its ruling.

The trial court remarked that the record was "replete with instances" establishing that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The trial court found that it was "absolutely essential" to protect the public from further criminal conduct by the Defendant. The trial court described the Defendant as "a serial killer, who like[d] to kill prostitutes," killing two women in this state, as well as killing women in other states for which he had charges pending. The trial court explained further,

> And obviously given his cavalier attitude about how to treat people, human beings, whatever their vocation is, whatever their station in life is, this man, the severity of it, as I said a moment ago, he's a serial killer. And so, accordingly, I find, using the factors outlined in Wilkerson, . . . I agree that the [D]efendant's behavior exhibits little or no regard for human life and that those sentences here, the life plus two shall run consecutive to the [thirty] years plus the life sentence in Davidson County. All to run consecutive.

We conclude that the trial court's findings are supported by the record and that the trial court gave due consideration to the Wilkerson factors. The victim was shot in the head, and her nude body was dumped in a trash can at the back of a truck stop. The Defendant casually told his employer, referring to prostitutes, "I just shoot them." This was the Defendant's second murder conviction for such an offense, and the trial court aptly noted that other states had murder charges pending against the Defendant for similar offenses. The Defendant can indeed be classified as a serial killer. Moreover, the Defendant solicited the murder of three State's witnesses from inside a jail cell in an effort to cover up his crimes. We agree with the trial court that the imposition of consecutive sentences, given the severity of the Defendant's crimes, is "absolutely essential" to protect the public from further criminal conduct by the Defendant. Accordingly, we conclude that the trial court did not abuse its discretion by classifying

the Defendant as a dangerous offender.  The trial court's consecutive sentencing decision is affirmed.[6]

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[6] The Defendant also argues that he should get jail credit on his sentence since his August 14, 2007 indictment date in this case.  The trial court found that this issue was rendered moot by its decision to impose consecutive sentencing.  We are constrained to agree.